IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
KANSAS CITY DIVISION

THOMAS J. RASMUSSEN, DANIEL        )
STECHSCHULTE, and MARK RASMUSSEN,  )
                                   )
         Plaintiffs,               )
                                   )
v.                                 )        Case No. 24-2081
                                   )
FOUNDATION FOR AFFORDABLE HOUSING, )
a Nebraska non-profit corporation, )        **JURY DEMAND**
                                   )
         Defendant.                )

---

**COMPLAINT**

---

Plaintiffs Thomas Rasmussen, Daniel Stechschulte, and Mark Rasmussen, by and through their undersigned attorneys and for their Complaint against Defendant Foundation for Affordable Housing state and allege as follows:

**INTRODUCTION**

1.      This case relates to a line of similar cases that have emerged around the country in recent years concerning affordable housing developed under the federal government's Low-Income Housing Tax Credit ("LIHTC") program, 26 U.S.C. §42, involving the proper distribution of proceeds arising from a sale of the affordable housing property after the end of the LIHTC program's mandatory 15-year "Compliance Period."

2.      The affordable housing in question here is the 7-building complex with 144 total apartment units, commonly known as Cross Creek Apartments and located on approximately 8.3 acres of land situated at 325 Ambrose Run, Beaufort, South Carolina (the "Apartment Complex").

3.      The Apartment Complex was owned by Cross Creek Apartment Holdings, LLC (the "Company"), in which Defendant is the "Managing Member" and Plaintiffs are the "Investor

Members" who contributed capital to the Company to assist with financing the development of the Apartment Complex as affordable housing in exchange for carefully negotiated rights and benefits.

4.     Unlike typical LIHTC investors—*i.e.*, large institutional investors such as banks, insurance companies, and large corporations primarily interested in acquiring tax benefits to offset large, predictable, annual tax liabilities—the Investor Members here are individuals and, as such, they specifically negotiated for significant economic benefits in addition to the tax benefits they bargained for and received from the Company's participation in the LIHTC program, including a 50% share of any net proceeds the Company might receive from a sale of the Apartment Complex.

5.     Accordingly, the Company's Operating Agreement, which controls the rights and obligations of the parties and is dated as of December 31, 2009 (the "Operating Agreement"), contains a plain and unambiguous provision at Section 4.02(b) that entitles the Investor Members to share net sale proceeds equally (50%) with the Managing Member.  A true and correct copy of the Operating Agreement is attached hereto as **Exhibit A**.

6.     The parties specifically negotiated for this 50% sharing agreement from the inception of their relationship, which formed an important consideration for the Investor Members' decision to invest in the Company and was thus reflected in the Investor Members' investment assumptions shared with Defendant when negotiating their investment.  A true and correct copy of the investment assumptions is attached hereto as **Exhibit B**.

7.     However, in breach of this contractual right and obligation, and its fiduciary duties owed to the Investor Members, the Managing Member caused the Company to close on a sale of the Apartment Complex *without notice to* the Investor Members, failed to distribute 50% of the net proceeds from the sale to them, and has persistently refused to remedy the violations.

8.      Instead, from a sale of the Apartment Complex fetching a price of over twenty million dollars and producing net sale proceeds of over seven million dollars, the Managing Member sent the Investor Members a distribution of just over $84,000 each, while retaining the balance of the net proceeds for itself (and potentially others).  If the Managing Member had distributed 50% of the balance of net proceeds to the Investor Members as contractually required and pursuant to its fiduciary duties, then the Investor Members (collectively) would have received over $3,500,000.

9.      Accordingly, the Investor Members bring this action to (i) enforce the Operating Agreement and their right to receive a proper distribution of net proceeds, and (ii) recover damages, along with all other just, proper, equitable and statutory relief that may be available, including attorney's fees, costs, and disbursements.

## PARTIES

10.      Plaintiff Thomas J. Rasmussen is an individual and a citizen of Kansas.  He owns a 33% interest in the Company as an Investor Member.

11.      Plaintiff Daniel Stechschulte is an individual and a citizen of Kansas.  He owns a 33% interest in the Company as an Investor Member.

12.      Plaintiff Mark Rasmussen is an individual and a citizen of Kansas.  He owns a 33% interest in the Company as an Investor Member.

13.      Defendant Foundation for Affordable Housing is a Nebraska non-profit corporation with a principal office located at 320 North 22nd Street, Omaha, Nebraska 68102.  Defendant owns the remaining 1% interest in the Company and is responsible for the management of the Company as its Managing Member.

**JURISDICTION, VENUE, AND CHOICE OF LAW**

14.     This case and controversy involves citizens of different states.  Plaintiffs are all citizens of Kansas, and Defendant is a citizen of Nebraska.

15.     The amount in controversy exceeds $75,000, exclusive of interest and costs.

16.     This Court thus has diversity jurisdiction under 28 U.S.C. § 1332(a)(1).

17.     Venue is proper in the United States District Court for the District of Kansas pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events or omissions giving rise to this claim occurred in Kansas.

18.     This Court has personal jurisdiction over the parties consistent with principles of fair play, substantial justice, and due process because the parties have made sufficient minimum contacts in the State of Kansas by virtue of doing business in the State of Kansas by soliciting investors, such as the Investment Members, from Kansas, entering into a contract with Kansas citizens, and causing injury to Kansas citizens by breach of an agreement entered into in Kansas.

19.     The Operating Agreement is governed by the laws of South Carolina.

**FACTUAL ALLEGATIONS**

**I.      The Low-Income Housing Tax Credit Program**

20.     The low-income housing tax credit (the "Tax Credit")—made available through the LIHTC program—is a federal tax credit that is generated from certain multi-unit housing projects that satisfy a number of requirements, including, without limitation, an agreement by the property owner to rent, for a statutorily prescribed period of time, certain units to households with incomes below certain qualified limits at rents that do not exceed federally-mandated maximums.

21.     The LIHTC program is governed by 26 U.S.C. § 42 ("Section 42"), certain Treasury Regulations, guidance from the United States Department of Treasury and the Internal

Revenue Service, and state-specific procedures contained in various documents adopted by designated housing agencies in each state (collectively, the "Tax Credit Rules").

22.    Congress enacted the LIHTC program in 1987 to address the shortage of affordable housing in the United States.

23.    The key feature of the LIHTC program is the Tax Credit, which provides a generous dollar-for-dollar tax liability offset, thus incentivizing investors with large, annual income tax obligations—typically large institutional investors such as U.S. banks, insurance companies, and large corporations—to invest capital in the development of affordable housing. *See SunAmerica Hous. Fund 1050 v. Pathway of Pontiac, Inc.*, [hereinafter, "*Pathway*"] 33 F.4th 872, 874 (6th Cir. 2022) (citing H.R. Rep. No. 101-247, 101st Cong., 1st Sess., at 1188 (1989) (giving "tax incentives to private investors...is the most appropriate way to achieve th[e] aim" of increasing affordable housing)).

24.    Because developers rarely have sufficiently large, predictable income tax obligations to make use of Tax Credits, the LIHTC program facilitates the "sale" of these Tax Credits to tax-credit investors in exchange for capital needed to develop affordable housing properties. *Id.*; *Low-Income Housing Tax Credits: Affordable Housing Investment Opportunities for Banks*, Office of the Comptroller of the Currency [hereinafter "Comptroller Report"], at 3, 23 (March 2014)[1]; Keightley, *An Introduction to the Low-Income Housing Tax Credit*, Congressional Research Service [hereinafter, "CRS Report RS22389"], at Summary & 1, 5 (Jan. 26, 2021)[2]; Khadduri *et al.*, *What Happens to Low-income housing Tax Credit Properties at Year 15 and*

---

[1]    *Available at* https://www.occ.gov/publications-and-resources/publications/community-affairs/community-developments-insights/ca-insights-mar-2014.html.
[2] *Available at* https://sgp.fas.org/crs/misc/RS22389.pdf.

*Beyond?*, U.S. Department of Housing and Urban Development ("HUD") [hereinafter, "Year 15 HUD Report"], at 25 (August 2012).[3]

25.     Generally, in a low-income housing project (a "project"), the project owner is organized as a limited partnership or limited liability company (the "project partnership"—here, the Company), in which a "project sponsor" (which may be a for-profit developer or a non-profit organization—here Defendant) acts as the general partner or managing member of the project partnership.

26.     The project sponsor first obtains an allocation of Tax Credits on behalf of the project partnership by engaging in a complex, "extremely competitive" application process. Comptroller Report at 24, CRS Report RS22389 at 4; Year 15 HUD Report at 56; *Pathway of Pontiac*, 33 F.4th at 874.

27.     Once the Tax Credits are awarded, the project partnership becomes entitled to collect the Tax Credits over a ten-year period following the project being "placed in service," known as the "Credit Period"; however, to secure the Tax Credits from "recapture" by the IRS, the project partnership must comply with complex federal rent restrictions for a concurrently running fifteen-year period, referred to earlier as the Compliance Period.  Comptroller Report at 3, 23; CRS Report RS22389 at 4; Year 15 HUD Report at xiii, 29.

28.     For Tax Credits awarded after 1989 (as here), a project partnership must also comply with rent restrictions for, at minimum, an additional fifteen-year period after the end of the Compliance Period, known as the "Extended Use Period."  *Id*.  However, the Tax Credits are fully secured as of the conclusion of the Compliance Period and there is no risk of recapture during the Extended Use Period.  *Id.*

---

[3] *Available at* https://www.huduser.gov/publications/pdf/what_happens_lihtc_v2.pdf.

29.     If the project sponsor secures an award of Tax Credits through this highly competitive process, it typically then "sells" the Tax Credits to one or more tax-credit investors, who will be admitted into the existing project partnership through a carefully negotiated agreement.

30.     A tax-credit investor is admitted as a limited partner or member based on an agreement to make capital contributions to the project partnership specifically in exchange for the allocation of substantially all of the Tax Credits awarded to the project partnership, along with certain other bargained-for benefits (primarily, income losses and property depreciation deductions).  *E.g.*, *JER Hudson*, 275 A.3d at 764-65 ("[D]evelopers 'sell' the tax credits to private investors, usually through a syndicator, in exchange for an equity investment in the housing project."); *Pathway*, 33 F.4th at 874.

31.     Because the amount of capital invested is typically based on the amount of Tax Credits and other tax benefits forecasted to be received, the amount invested as a capital contribution is referred to in the LIHTC industry as the "price" paid for the Tax Credits. Comptroller Report at 23; *see also id.* at 22 ("LIHTC investors receive financial benefits on their investments through the [Tax Credits], as well as the additional deductions from real estate losses.").

32.     Because tax benefits (*i.e.*, Tax Credits and tax losses) flow to partners in a LIHTC partnership in accordance with their respective ownership interest percentages in the project partnership, the tax-credit investor is given 99-percent-plus of the ownership interests in the project partnership, but this does not equate to a 99-percent-plus economic or equity interest in the LIHTC partnership's operations or residual capital transaction proceeds.  Comptroller Report at 3; CRS Report RS22389 at 5; Year 15 HUD Report at 25, 32.

33.     The tax-credit investor meanwhile assumes only a "passive," restricted role in the operations and management of the project and project partnership. *AMTAX Holdings 227, LLC v. Tenants' Dev. II Corp.*, 15 F.4th 551, 553 (1st Cir. 2021) ("large ownership percentage with an otherwise passive role"); *Pathway of Pontiac*, 33 F.4th at 874-75, 881; *JER Hudson*, 275 A.3d at 766 ("Institutional investors seeking tax credits invest as limited partners with only a few enumerated consent rights.").

34.     Correspondingly, project sponsors typically hold 1-percent or less of the ownership interests in the project partnership.  However, as the general partner or managing member, they are responsible for the project partnership's operations and the project's development, management, and compliance with the LIHTC program for the life of the project, and in no event less than the fifteen-year Compliance Period.  Year 15 HUD Report at 25; *see also* Comptroller Report at 3, 16; CRS Report RS22389 at 6.

35.     The project sponsor also assumes most of the risk associated with investing in the Tax Credits by providing investors with completion, operating, and tax delivery guarantees, with an unconditional guarantee of construction completion being most important because an unfinished project cannot produce Tax Credits.  Comptroller Report at 17, 24.  Such agreements effectively act as "guarantees on investment yields" for the tax credit investor.  *Id.*

36.     As a result, in a typical LIHTC project partnership the project sponsor is contractually entitled to receive the supermajority of economic benefits, including real estate equity that may appreciate over time, arising from the partnership because the tax credit investor is receiving substantially all of the partnership's other primary benefits (*i.e.*, the tax benefits). Accordingly, these parties will negotiate how the project partnership's economic benefits are to be split between the partners, including how, if any, cash flow from annual operations will be

distributed among the partners, and how, if any, net proceeds from a sale or refinance of the affordable housing property occurring before the project partnership is dissolved will be distributed to the partners.

37.    At the end of a statutorily prescribed 15-year "Compliance Period" (commonly referred to as "Year 15"), the tax credit investor limited partner has collected all Tax Credits and other desired tax benefits, and those benefits are fully secured from recapture by the IRS.

38.    It is well-documented that participation in the LIHTC program results in the formation of a unique business arrangement, governed by unique, carefully negotiated contracts that alter the typical bargained-for exchange in conventional real-estate business ventures. *E.g.*, Zaner, *The low-income housing tax credit*, National Real Estate Investor (April 1, 1996) ("Investors are not looking at these [LIHTC] properties to generate traditional real estate benefits in the same way as conventional multifamily investments – it's not the cash flow they're looking at - but the ability to reduce their federal tax liability.").

39.    While it is common in the LIHTC industry for the project sponsor to receive the supermajority of a project partnership's economic benefits, the Company here was unique given that the tax-credit investors were individuals and not large institutional investors.  Thus, the Operating Agreement has unique characteristics based on the circumstances that gave rise to the parties' negotiations that formed the basis for their agreement to become partners in their affordable housing endeavor.

40.    Upon information and belief, because Defendant had a Tax Credit award but no institutional tax-credit investor interested in purchasing the Tax Credits at the time, the Investor Members were sought out for their participation as individual members in the Company.  As such, rather than assign a supermajority of proceeds from a sale of the Apartment Complex to Defendant,

the parties agreed that net proceeds from a sale of the Apartment Complex would be evenly shared

(50% to Defendants and 50% to the Investor Members).  *See* Exhibit A at Section 4.02(b).

**II.    The Operating Agreement**

41.    Article 2 of the Operating Agreement provides defined terms.

42.    Section 4.02(b) of the Operating Agreement governs the distribution of net

proceeds from a sale of the Apartment Complex as follows:

> Prior to dissolution of the Company, if the Managing Member shall determine from
> time to time that Net Proceeds are available for distribution from a Capital Event,
> such Net Proceeds shall be applied or distributed as follows:
>
> (i) First, to fund reserves for contingent liabilities to the extent deemed
> reasonable by the Managing Member and Consented to by the Investor
> Member;
>
> (ii) Second, to the payment of any outstanding loan from the Managing
> Member or its affiliates (if any), and then to the payment of any Operating
> Deficit Loans, with any such payments to be applied first to accrued but
> unpaid interest and second to principal and then;
>
> (iii) ***Third, the balance shall be distributed 50% to the Managing Member
> and 50% to the Investor Members (in the aggregate).***"

(emphasis added).

43.    The Operating Agreement defines a "Capital Event" as: "any transaction the

proceeds of which are not includable in Cash Flow, ***including without limitation, the sale or other***

***disposition of all or any substantial part of the assets of the Company*** . . . ."  *See* Exhibit A at

Article II (emphasis added).

44.    The Operating Agreement defines "Net Proceeds" as:

> "*Net Proceeds*" means the difference between (A) the sum of (i) the gross proceeds
> from a Capital Event other than a refinancing; (ii) the excess proceeds from the
> refinancing of any loan on the Apartment Complex (that is, any refinancing
> proceeds not needed for the repayment of the loan refinanced); and (iii) the receipt
> of any proceeds from insurance settlements or other claims attributable to fire or
> other casualty, or from condemnation, sales or grants of easements, rights-of-way
> or the like in excess of those needed for repair, restoration or replacement of the

10

damaged, destroyed, or condemned property and (B) the payment of or due provision for (i) all liabilities to creditors of the Company (excluding, except in the event of the dissolution and liquidation of the Company, fees owed to the Managing Member and loans to the Company from the Managing Member of Affiliates thereof for any purpose, including, without limitation, Operating Deficit Loans) and (ii) necessary and customary expenses of such Capital Event or refinancing (other than, except   in the event of the dissolution and liquidation of the Company, expenses payable to the Managing Member or an Affiliate thereof).

*See* Exhibit A at Article II.

45.    Provisions like Section 4.02(b) of the Operating Agreement are commonly referred to as a "Capital Transactions Waterfall" or "Sale Proceeds Waterfall."

46.    The Operating Agreement defines the Apartment Complex to be, collectively, "the 7-building complex with 144 total apartment units known as Cross Creek Apartments located on approximately 8.3 acres of land located at 325 Ambrose Run, Beaufort, South Carolina . . . and ancillary and appurtenant facilities and all furnishings, equipment, land, real property and personal property used in connection with the operation thereof." *See* Exhibit A at Article II.

47.    The stated purpose of the Company is to "acquire, finance, own, construct, rehabilitate, maintain, improve, operate, lease and, if appropriate or desirable, sell or otherwise dispose of the Apartment Complex in a manner consistent with the requirements of Section 42 of the Code.  The Company shall engage in no other business or activity."  *See* Exhibit A at Section 1.04.

48.    The Apartment Complex is a Company asset and represents substantially all of the assets of the Company, although the Company owns other assets as reflected in its financial statements.

49.    The Company's sale of the Apartment Complex is a Capital Event.

50.    The Company closed on a sale of the Apartment Complex on or about September 12, 2022.

51.    The sale of the Apartment Complex occurred in the ordinary course of the Company's business.

52.    The Company sold the Apartment Complex prior to the Company being dissolved.

53.    The Company did not sell the Apartment Complex as part of a post-dissolution liquidation of the Company's assets.

54.    The sale produced Net Proceeds, as defined in Article II of the Operating Agreement (the "Net Proceeds").

55.    Section 4.02(b) governs the manner in which Defendant was to cause the Company to distribute the Net Proceeds.

56.    Section 1.05 of the Operating Agreement identifies events that will eventually result in the Company dissolving prior to December 31, 2060, which is the term during which the Company is otherwise to remain in full force and effect.

57.    Section 1.05(a)(i) of the Operating Agreement provides that the Company shall be dissolved and its assets liquidated upon the sale or other disposition of all or substantially all of the assets of the Company.

58.    A sale of the Apartment Complex is thus an event that will lead to the subsequent dissolution of the Company and a liquidation of its remaining assets, which will not include Net Proceeds because, among other reasons, the Company will have distributed the Net Proceeds pursuant to Section 4.02(b) of the Operating Agreement upon receipt thereof.

59.    In sum, after the sale of the Apartment Complex is closed, subsequent obligations are triggered to later dissolve the Company pursuant to Section 1.05(a)(i) of the Operating Agreement.

60.     In particular, following the sale of Apartment Complex, the Company is obligated, through Defendant, to wind up its affairs, which will require it to (a) discharge its remaining obligations and liabilities, and (b) liquidate the Company's remaining assets and distribute the liquidation proceeds.

61.     During the winding up period (the "Liquidation Phase"), and pursuant to Sections 1.05 and 4.03 of the Operating Agreement, the Managing Member conducts and supervises (as a "Liquidating Agent") the various Company activities associated with the liquidation of the Company's remaining assets.  The Managing Member, as Liquidating Agent, is permitted to engage or hire professionals to assist in the Liquidation Phase, including accountants, auditors, and attorneys.

62.     Section 4.03 of the Operating Agreement governs the distribution of the liquidation proceeds, *i.e.*, the proceeds from a sale or other disposition of the Company's remaining assets.  In that case, after payment of Company debts and obligations, the remaining assets of the Company that are liquid or have been liquidated "shall be distributed pro rata to the Members in accordance with their respective positive Capital Account balances after taking into account all Capital Account adjustments for the year."

63.     Pursuant to Section 4.03 of the Operating Agreement and as the Liquidating Agent, the Managing Member shall ensure that liquidation distributions to members in accordance with the respective ratios of their positive Capital Account balances are made "by the end of the taxable year in which the liquidation occurs or, if later, within 90 days after the date of liquidation."

64.     As such, after the Company sells the Apartment Complex and while it is winding up its affairs through liquidation and dissolution related activities, the Investor Members and Managing Member remain members in the Company.

65.     The Company is not dissolved, liquidated, and terminated on the date of the sale, and thus the Net Proceeds are to be distributed in accordance with Section 4.02(b) of the Operating Agreement, whereby the Company's dissolution and the liquidation of its remaining assets will occur many months afterwards and typically in the calendar year following the date of the sale.

66.     Section 6.04(b) of the Operating Agreement obligates the Managing Member to indemnify the Investors Members:

> from and against any loss, liability, damage, cost or expense (including reasonable attorney's fees) to the extent that (i) the Managing Member's acts and/or omissions constituted a violation of law, fraud, willful misconduct, or gross negligence, (ii) the Managing Member breached its fiduciary duty or any obligation under this Agreement and such breach had a material adverse effect on the Company or the Investor Member; or (iii) the Managing Member materially breached any of the representations or warranties set forth herein or the covenants set forth herein, which breach had a material adverse effect on the Company or on the Investor Member.

67.     Section 6.04(c) further provides that the Investor Members' indemnification rights "shall survive dissolution of the Company…and shall be cumulative of, and in addition to, any and all rights, remedies and recourses to which the Investor Member[s] shall be entitled, whether pursuant to the provisions of this [Operating] Agreement, at law or in equity."

68.     Section 6.09(f) and 12.04 of the Operating Agreement grant the Investor Members the right to examine the Company's financial records and receive annual financial reports.

## III.    The Current Dispute

69.     The Compliance Period for the Company ended on December 31, 2022.

70.     The Investor Members were not and are not in default under the Operating Agreement or any Project Document (as defined in the Operating Agreement), and they have satisfied any and all conditions of the Operating Agreement.

71.     On September 12, 2022, the Company closed on a sale of the Apartment Complex to a third party without notice to or consent from the Investor Members.

72.    The Investor Members were unaware of the sale of the Apartment Complex until they received a letter from the Managing Member dated December 12, 2022 (the "Notification Letter").  A true and correct copy of the Notification Letter is attached hereto as **Exhibit C**.

73.    The Notification Letter states: "On September 12, 2022 Cross Creek Apartments was sold to an affiliate of Lincoln Avenue Capital, one of the largest owners and developers of affordable housing in the country.  As a result, since Cross Creek [the Company] has no remaining assets, the entity is being dissolved." *See* Exhibit C at 1.

74.    The Notification Letter continues: "The proceeds of the sale were allocated among the members pursuant to Sections 4.03 and 4.04 of the Cross Creek Operating Agreement." *Id*.

75.    Attached to the Notification Letter was a Notice of Intent to Dissolve Cross Creek Apartments Holdings, LLC, dated December 8, 2022, which provides: "Pursuant to Article I, Section 1.05 of the Operating Agreement for Cross Creek Apartments Holdings, LLC, Foundation for Affordable Housing, as managing member, is providing written notice of the dissolution of Cross Creek Apartments Holdings, LLC.  Foundation for Affordable Housing will file the Articles of Termination with the South Carolina Secretary of State to effectuate the dissolution."  The Notice of Intent to Dissolve was executed by Mark A. Hiatt, President of the Managing Member. *See* Exhibit C at 2.

76.    The Managing Member did not notify the Investor Members of its intent to sell the Apartment Complex.

77.    The Managing Member did not seek consent from the Investor Members to sell the Apartment Complex.

78.    According to the Managing Member's Notification Letter, the sale of the Apartment Complex produced Net Proceeds and occurred prior to the dissolution of the Company.

79.     The Investor Members, however, received purported final distribution checks in the amount of $84,890.00 per each Investor Member and Schedule K-1 tax forms by cover letter dated February 21, 2023 (the "Distribution Notice").

80.     The Distribution Notice did not include further information about the sale of the Apartment Complex but incorrectly stated: "The net sale proceeds were allocated in accordance with the Cross Creek Operating Agreement and all allocations were reviewed by Lutz and Company as part of their preparation of the final tax return."

81.     The Investor Members have demanded the relevant financial statements and documents from the Managing Member related to the sale of the Apartment Complex and subsequent dissolution of the Company.

82.     The Purchase and Sale Settlement Statement from the sale of the Apartment Complex on September 12, 2022, a true and correct copy of which is attached hereto as **Exhibit D**, reveals that the Apartment Complex was sold for $20,750,000.00.

83.     After the payment of all debts and obligations of the Apartment Complex, the Net Proceeds available for distribution under Section 4.2(b) was $7,045,563.29. *See* Exhibit D.

84.     The Distribution Notice and attached Schedule K-1 demonstrates that the Managing Member distributed the Net Proceeds according to Sections 4.03 and 4.04, rather than Section 4.02(b), and thus distributed the proceeds from the sale of the Apartment Complex as if they were liquidation proceeds received from liquidating the Company's remaining assets following the dissolution of the Company, rather than Net Proceeds received from a Capital Event occurring prior to dissolution of the Company.

85.     In doing so, the Managing Member distributed approximately $6,790,000 to itself, in plain breach of the Operating Agreement and their fiduciary duties to the Investor Members.

## <u>COUNT I</u>
## <u>BREACH OF CONTRACT</u>

86.    The Investor Members fully incorporate the above paragraphs by reference as if fully stated herein.

87.    The Operating Agreement is a valid, enforceable, and binding contract governed by the principles of the law of the State of South Carolina.

88.    The Investor Members are not and have never been in default of the Operating Agreement, and they have performed all of their duties and obligations under the Operating Agreement.

89.    The Operating Agreement requires that, upon a pre-dissolution Capital Event resulting in Net Proceeds, the Company distribute the Net Proceeds in accordance with Section 4.02(b), which results in a 50/50 share of Net Proceeds between the Managing Member and Investor Members.

90.    The sale of the Apartment Complex by the Company on September 12, 2022, was a Capital Event.

91.    The sale of the Apartment Complex occurred before the separate and distinct dissolution of the Company and liquidation of its remaining assets.

92.    The Managing Member was obligated, on behalf of the Company, to distribute Net Proceeds pursuant to Section 4.02(b).

93.    The Managing Member breached the Operating Agreement by failing to distribute the Net Proceeds as required by the Operating Agreement.

94.    As a result of the Managing Member's breach of the Operating Agreement, Investor Members have not received their bargained-for distribution as required by the Operating Agreement and as anticipated in their investment assumptions provided to the Managing Member.

95.    The Managing Member has caused the Investor Members to suffer damages.

96.    The Investor Members are entitled to a finding that:

a.    The sale of the Apartment Complex is a pre-dissolution Capital Event, as defined in the Operating Agreement;

b.    Section 4.02(b) of the Operating Agreement governs the distribution of Net Proceeds received from the sale of the Apartment Complex;

c.    The liquidation and dissolution provisions of the Operating Agreement, including Section 4.03, do not control, alter, or supersede the manner by which the Net Proceeds received from the sale of the Apartment Complex must be distributed;

d.    The sale of the Apartment Complex and distribution of Net Proceeds therefrom are separate and distinct from the subsequent dissolution and liquidation of the Company, whereby the Net Proceeds are first distributed pursuant to Section 4.02(b) of the Operating Agreement, and then, at a much later time, the Company's remaining assets are liquidated and distributed pursuant to Sections 1.05 and 4.03 of the Operating Agreement, when the Company is subsequently wound up and dissolved in the months or year following the sale of the Apartment Complex;

e.    The Net Proceeds are not liquidation proceeds;

f.    The Managing Member has breached the Operating Agreement by refusing to properly distribute the Net Proceeds to the Investor Members as described above, which had a material adverse effect on the Investor Members;

g.    The Investor Members (collectively) are entitled to 50% of the Net Proceeds from the sale of the Apartment Complex; and

h.    Under Section 6.04 of the Operating Agreement, the Managing Member must indemnify the Investor Members from and against any loss, damage, cost, or expense (including reasonable attorney fees) due to the Managing Member's breach of contract.

WHEREFORE, the Investor Members pray for relief as follows:

A court order and judgment finding that:

a.    The sale of the Apartment Complex is a pre-dissolution Capital Event, as defined in the Operating Agreement;

b.    Section 4.02(b) of the Operating Agreement governs the distribution of the Net Proceeds received from the sale of the Apartment Complex;

c.    The liquidation and dissolution provisions of the Operating Agreement, including Section 4.03, do not control, alter, or supersede the manner by which the Net Proceeds received from the sale of the Apartment Complex must be distributed;

d.    The sale of the Apartment Complex and distribution of Net Proceeds therefrom are separate and distinct from the subsequent dissolution and liquidation of the Company, whereby the Net Proceeds are first distributed pursuant to Section 4.02(b) of the Operating Agreement, and then, at a much later time, the Company's remaining assets are liquidated and distributed pursuant to Sections 1.05 and 4.03 of the Operating Agreement, when the Company is subsequently wound up and dissolved in the months or year following the sale of the Apartment Complex;

e.    The Net Proceeds are not liquidation proceeds;

f.    The Managing Member has breached the Operating Agreement by refusing to properly distribute the Net Proceeds to the Investor Members as described above, which had a material adverse effect on the Investor Members;

g.    The Investor Members (collectively) are entitled to 50% of the Net Proceeds from the sale of the Apartment Complex;

h.    The Investor Members are entitled to damages caused by the Managing Member's breach of contract in an amount to be proven at trial; and

i.    Under Section 6.04 of the Operating Agreement, the Managing Member must indemnify the Investor Members from and against any loss, damage, cost, or expense (including reasonable attorney fees) due to the Managing Member's breach of contract.

## COUNT II
## BREACH OF FIDUCIARY DUTY

97.    The Investor Members fully incorporate the above paragraphs by reference as if fully stated herein.

98.    The South Carolina Uniform Limited Liability Company Act of 1996 (the "Act") defines the fiduciary duties owed by the members in a member-managed LLC.  *See* S.C. Code Ann. §§ 33-44-409(a)–(c).

99.    The Company is a member-managed LLC.

100.    The Managing Member owes a duty of loyalty to the Company and to the Investor Members.  *See* S.C. Code Ann. § 33-44-409(b).

101.    The Managing Member's duty of loyalty requires it to "account to the company and hold as trustee for it any property, profit, or benefit" derived by a member from the Apartment Complex.  *See* S.C. Code Ann. § 33-44-409(b)(1).

102.    The Managing Member did not account to the Company and hold for the Company the Net Proceeds to be distributed per the provisions of the Operating Agreement.  Rather, the Managing Member distributed the supermajority of the Net Proceeds to itself, in contravention of the bargained-for distribution provisions agreed to in the Operating Agreement.

103.    In doing so, the Managing Member has breached its duty of loyalty to the Investor Members.

104.    The Managing Member owes a duty of care to the Company and to the Investor Members.  *See* S.C. Code Ann. § 33-44-409(c).

105.    The Managing Member's duty of care requires it to refrain from "engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of the law" in the conduct of the Company.  *See* S.C. Code Ann. § 33-44-409(c).

106.    The Managing Member has actual knowledge of the terms of the Operating Agreement, including the provision requiring it to distribute the Net Proceeds on a 50/50 basis between the Managing Member and Investor Members (in the aggregate).

107.    Even with this actual knowledge of the proper distribution of the Net Proceeds, the Managing Member proceeded with the sale of the Apartment Complex, began winding up the Company, and impermissibly retained the supermajority of the Net Proceeds, all without account to the Investor Members and completed without their consent.

108.    Therefore, the Managing Member knowingly violated the Operating Agreement and the Act.

109.    At the least, the Managing Member's conduct was grossly negligent or reckless.

110.    Therefore, the Managing Member has breached its duty of care to the Investor Members.

111.    The Investor Members are entitled to a finding that:

    a.    The Managing Member breached its duty of loyalty to the Investor Members, which had a material adverse effect on the Investor Members;

    b.    The Managing Member breached its duty of care to the Investor Members, which had a material adverse effect on the Investor Members; and

    c.    Under Section 6.04 of the Operating Agreement, the Managing Member must indemnify the Investor Members from and against any loss, damage, cost, or expense (including reasonable attorney fees) due to the Managing Member's breach of its fiduciary duties.

WHEREFORE, the Investor Members pray for relief as follows:

A court order and judgment finding that:

    a.    The Managing Member breached its duty of loyalty to the Investor Members, which had a material adverse effect on the Investor Members;

    b.    The Managing Member breached its duty of care to the Investor Members, which had a material adverse effect on the Investor Members;

    c.    The Investor Members are entitled to damages caused by the Managing Member's breaches of its fiduciary duties in an amount to be proven at trial; and

    d.    Under Section 6.04 of the Operating Agreement, the Managing Member must indemnify the Investor Members from and against any loss, damage, cost, or expense (including reasonable attorney fees) due to the Managing Member's breach of its fiduciary duties,

## COUNT III
## BREACH OF OBLIGATION OF GOOD FAITH AND FAIR DEALING

112.    The Investor Members fully incorporate the above paragraphs by reference as if fully stated herein.

113.    The Act requires that a member of a member-managed LLC shall discharge its duties to the Company and to other members "under this chapter or under the operating agreement and exercise any rights consistently with the obligation of good faith and fair dealing." *See* S.C. Code Ann. § 33-44-409(d).

114.    As set forth in this Complaint, the Managing Member has breached the Operating Agreement, breached its fiduciary duties to the Investor Members, and violated the Act.

115.    The Managing Member has improperly exercised its rights as manager of the Company by (i) selling the Apartment Complex without the Investor Members' knowledge or consent; (ii) distributing the Net Proceeds in contravention of the clear and unambiguous terms of the Operating Agreement; and (iii) failing to properly account for the Net Proceeds to the Investor Members following the sale of the Apartment Complex.

116.    The Managing Member has violated its obligation to deal with the Investor Members in good faith and fair dealing.

117.    The Investor Members are entitled to a finding that:

   a.    The Managing Member has violated its obligation of good faith and fair dealing to the Investor Members, which had a material adverse effect on the Investor Members; and

   b.    Under Section 6.04 of the Operating Agreement, the Managing Member must indemnify the Investor Members from and against any loss, damage, cost, or expense (including reasonable attorney fees) due to the Managing Member's violation of the Act.

WHEREFORE, the Investor Members pray for relief as follows:

A court order and judgment finding that:

   a.    The Managing Member has violated its obligation of good faith and fair dealing to the Investor Members, which had a material adverse effect on the Investor Members;

b.      The Investor Members are entitled to damages caused by the Managing Member's breach of its obligations of good faith and fair dealing in an amount to be proven at trial; and

c.      Under Section 6.04 of the Operating Agreement, the Managing Member must indemnify the Investor Members from and against any loss, damage, cost, or expense (including reasonable attorney fees) due to the Managing Member's violation of the Act.

**COUNT IV**
**VIOLATION OF SOUTH CAROLINA UNIFORM LIMITED LIABILITY COMPANY ACT OF 1996**

118.    The Investor Members fully incorporate the above paragraphs by reference as if fully stated herein.

119.    The Act governs the relationship between members and managers of a limited liability company unless the operating agreement between the parties provides otherwise. *See* S.C. Code Ann. § 33-44-103(a). Therefore, where an operating agreement is silent on a point, the Act controls.

120.    The Act requires the consent of all members of a limited liability company in the event of a "sale, lease, exchange, or other disposal of all, or substantially all, of the company's property with or without goodwill." *See* S.C. Code Ann. § 33-44-404(c)(12).

121.    The Operating Agreement is silent on the matter of when the consent of the Investor Members is required for action by the Company.

122.    The Operating Agreement does not authorize the Managing Member to dispose of all or substantially all of the Company's assets—e.g., the Apartment Complex—without providing notification to or seeking consent from Investor Members.

123.    In the absence of such a provision in the Operating Agreement, the Act controls.

124.    As discussed above, the Managing Member indeed proceeded to sell the Apartment Complex and thereafter initiated Company liquidation proceedings, all without notice to or consent of the Investor Members.

125.    The Act also states that a member of a member-managed LLC who "votes for or assents to a distribution made in violation of . . . the operating agreement is personally liable to the company for the amount of the distribution which exceeds the amount that could have been distributed without violating . . . the operating agreement" if it is also established that the member did not comply with its duties outlined in Section 33-44-409 of the Act.  *See* S.C. Code § 33-44-407(a).

126.    The Managing Member took a distribution of the Company's Net Proceeds in violation of the terms of the Operating Agreement to enrich itself at the expense of the Investor Members and in violation of the parties' bargain.

127.    As stated above, the Managing Member did not comply with its fiduciary duties and obligations to the Investor Members as provided in Section 33-44-409 of the Act.

128.    Therefore, the Managing Member is liable to the Company for the improper distributions.

129.    The Act grants Investor Members the right to bring this action against the Managing Member:

(a) A member or manager may maintain an action against a limited liability company or another member or manager for legal or equitable relief, with or without an accounting as to the company's business, to enforce:

(1) the member's rights under the operating agreement;

(2) the member's rights under this chapter; and

(3) the rights that otherwise protect the interests of the member, including rights and interests arising independently of the member's relationship to the company.

S.C. Code Ann. § 33-44-410(a).

130.    The Investor Members are entitled to a finding that:

      a.    The Act requires the Managing Member to seek the Investor Members' consent prior to disposition of all or substantially all of the assets of the Company;

      b.    The Managing Member's failure to seek the Investor Members' consent prior to the sale of the Apartment Complex constitutes a violation of the Act, which had a material adverse effect on the Investor Members;

      c.    The Managing Member is liable for the unlawful distribution of the Net Proceeds in the amount which exceeded the amount it should have received under Section 4.02(b) of the Operating Agreement, which had a material adverse effect on the Investor Members; and

      d.    Under Section 6.04 of the Operating Agreement, the Managing Member must indemnify the Investor Members from and against any loss, damage, cost, or expense (including reasonable attorney fees) due to the Managing Member's violation of the Act.

WHEREFORE, the Investor Members pray for relief as follows:

A court order and judgment finding that:

      a.    The Act requires the Managing Member to seek Investor Members' consent prior to disposition of all or substantially all of the assets of the Company;

      b.    The Managing Member's failure to seek Investor Members' consent prior to the sale of the Apartment Complex constitutes a violation of the Act, which had a material adverse effect on the Investor Members;

      c.    The Managing Member is liable for the unlawful distribution of the Net Proceeds in the amount which exceeded the amount it should have received under Section 4.02(b) of the Operating Agreement, which had a material adverse effect on the Investor Members; and

      d.    Under Section 6.04 of the Operating Agreement, the Managing Member must indemnify the Investor Members from and against any loss, damage, cost, or expense (including reasonable attorney fees) due to the Managing Member's violation of the Act.

131.    Investor Members further pray for an award of its costs, expenses, disbursements, and attorney fees incurred incident to this proceeding, and any further relief the Court deems just, reasonable, and appropriate under the circumstances.

## JURY DEMAND

The Investor Members demand a trial by jury on all claims so triable.

Dated: March 8, 2024

*/s/ David A. Jermann*

David A. Jermann                    #19686
Pamela J. Winter                    #27138
2345 Grand Blvd., Suite 1500
Kansas City, MO 64108
816.221.3420
816.221.0786 (f)
djermann@atllp.com
pwinter@atllp.com

-and-

David A. Davenport (*pro hac vice forthcoming*)
**BC DAVENPORT, LLC**
105 5th Avenue South, Suite 375
Minneapolis, MN 55401
T: (612) 445-8010
david@bcdavenport.com

*Attorneys for Plaintiffs*