# EXHIBIT A

---

**CROSS CREEK APARTMENTS HOLDINGS, LLC**
(a South Carolina limited liability company)

---

OPERATING
AGREEMENT

Dated as of December 31, 2009

**CROSS CREEK APARTMENTS HOLDINGS, LLC**

**OPERATING AGREEMENT**

**TABLE OF CONTENTS**

**Page**

ARTICLE I
NAME AND BUSINESS

Section 1.01.    Name; Formation; Filings ................................................................. 2

Section 1.02.    Place of Business ............................................................................. 2

Section 1.03.    Names and Addresses of Members .................................................. 3

Section 1.04.    Purposes ........................................................................................... 3

Section 1.05.    Term and Dissolution ...................................................................... 3

Section 1.06.    Title to Apartment Complex ........................................................... 4

ARTICLE II
DEFINITIONS

Section 2.01.    Meanings .......................................................................................... 4

Section 2.02.    Pronouns and Plurals ....................................................................... 36

ARTICLE III
CAPITAL

Section 3.01.    Capital Contribution of Managing Member ..................................... 36

Section 3.02.    Admission of Investor Members ....................................................... 36

Section 3.03.    Capital Contribution of Investor Members ....................................... 37

Section 3.04.    Default ............................................................................................. 42

Section 3.05.    Credit Adjuster Distributions and Credit Adjustment Payments to the Investor Members ......................................................................... 43

Section 3.06.    No Interest on Capital Contribution; Return of Capital ................... 51

Section 3.07.    No Third-party Beneficiary .............................................................. 52

ARTICLE IV
PROFITS AND LOSSES; DISTRIBUTIONS; CAPITAL ACCOUNTS

Section 4.01.    Profits, Losses and Credits ............................................................... 52

Section 4.02.    Cash Distributions Prior to Dissolution ........................................... 53

Section 4.03.    Termination Distributions ................................................................ 59

Section 4.04.    Special Allocations ....................................................................... 60

Section 4.05.    Section 704(c) Allocations ............................................................. 66

Section 4.06.    Miscellaneous Allocations .............................................................. 66

### ARTICLE V
### COMPANY BORROWINGS

Section 5.01.    Authorization to the Managing Member ............................................. 67

Section 5.02.    Right To Mortgage ....................................................................... 67

Section 5.03.    Loans ...................................................................................... 68

### ARTICLE VI
### RIGHTS, POWERS AND OBLIGATIONS OF MANAGING MEMBER

Section 6.01.    Exercise of Management ................................................................ 68

Section 6.02.    Powers ..................................................................................... 69

Section 6.03.    Other Activities .......................................................................... 75

Section 6.04.    Liability to Company and Investor Members and Indemnification of
                 Investor Members and Company ...................................................... 76

Section 6.05.    Indemnification of Managing Member ............................................... 77

Section 6.06.    Dealing With Affiliates ................................................................. 79

Section 6.07.    No Salary Payable to Managing Member ............................................ 79

Section 6.08.    Representations and Warranties ....................................................... 79

Section 6.09.    Covenants Relating to the Apartment Complex and the Company ............... 86

Section 6.10.    Operating Deficit Loans ................................................................ 108

### ARTICLE VII
### PAYMENTS TO MANAGING MEMBERS AND AFFILIATES AND OTHERS

Section 7.01.    Property Management Fee .............................................................. 112

### ARTICLE VIII
### RIGHTS AND OBLIGATIONS OF INVESTOR MEMBERS

Section 8.01.    Liability of Investor Members ......................................................... 115

Section 8.02.    No Right To Manage, Partition or Dissolve ......................................... 115

Section 8.03.    Death or Disability of Investor Member ............................................. 116

Section 8.04.    Removal of a Managing Member ...................................................... 116

Section 8.05.    Outside Activities ....................................................................... 120

ARTICLE IX
TRANSFERABILITY OF INVESTOR MEMBERS INTERESTS

Section 9.01.     Consent of Managing Member Required for Assignment ........................... 121

Section 9.02.     Member Cooperation ...................................................................................... 121

ARTICLE X
WITHDRAWAL OF A MANAGING MEMBER; DISPOSITION OF A MANAGING
MEMBER'S INTEREST

Section 10.01.    Transfer and Withdrawal ................................................................................ 122

Section 10.02.    Obligation To Continue ................................................................................. 123

Section 10.03.    Withdrawal of All Managing Members ......................................................... 123

Section 10.04.    Additional Members ...................................................................................... 124

ARTICLE XI

MANAGEMENT AGENT AND MANAGEMENT FEE ...................................................... 127

ARTICLE XII
BOOKS AND RECORDS; ACCOUNTING; TAX ELECTIONS; ETC

Section 12.01.    Books and Records ........................................................................................ 130

Section 12.02.    Bank Accounts ............................................................................................... 131

Section 12.03.    Accrual Basis ................................................................................................. 131

Section 12.04.    Accountants .................................................................................................... 131

Section 12.05.    Federal Income Tax Elections ....................................................................... 132

ARTICLE XIII

[INTENTIONALLY LEFT BLANK] .................................................................................... 135

ARTICLE XIV
MISCELLANEOUS

Section 14.01.    Notice ............................................................................................................ 135

Section 14.02.    Amendments .................................................................................................. 137

Section 14.03.    Meetings ........................................................................................................ 137

Section 14.04.    Entire Agreement .......................................................................................... 138

Section 14.05.    Headings ........................................................................................................ 138

Section 14.06.    Separability Provisions ................................................................................. 138

Section 14.07.    Binding Agreement ....................................................................................... 138

Section 14.08.    Counterparts .................................................................................................. 139

Section 14.09.    Governing Law .............................................................................................. 139

Section 14.10.    Time of Admission .................................................................................. 139

Section 14.11.    Waiver of Jury Trial................................................................................. 140

Section 14.12.    Waiver of Certain Defenses........................................................................ 140

EXHIBIT A        CAPITAL CONTRIBUTION REQUEST [FORM]

EXHIBIT B        LEGAL DESCRIPTION OF APARTMENT COMPLEX

EXHIBIT C        MEMBER INFORMATION

## CROSS CREEK APARTMENTS HOLDINGS, LLC
### (a South Carolina limited liability company)

### OPERATING AGREEMENT

**THIS OPERATING AGREEMENT** of **CROSS CREEK APARTMENTS HOLDINGS, LLC**, a South Carolina limited liability Company (the "Company"), is made and entered into as of the 31st day of December, 2009 by and among **FOUNDATION FOR AFFORDABLE HOUSING**, a Nebraska non-profit corporation, as Managing Member, and **Thomas J. Rasmussen**, an individual, **Daniel Stechschulte**, an individual, and **Mark Rasmussen,** an individual (collectively are referred to herein as the "Investor Members").

WHEREAS, the Company was formed as a South Carolina limited liability company pursuant to Articles of Organization that were filed with the Filing Office on March 27, 2009; and

WHEREAS, the Investor Members, in exchange for their Capital Contributions, are to be admitted to the Company as of the Admission Date; and

WHEREAS, the parties hereto desire to enter into this Operating Agreement to provide for, among other things, (i) the continuation of the Company, as reconstituted, (ii) the admission of the Investor Members to the Company and (iii) a restatement of the rights, obligations and duties of the Members to each other and to the Company;

NOW, THEREFORE, in consideration of the mutual agreements set forth herein, it is agreed and certified that the any prior written or verbal agreement (if any) between the Members is hereby superseded and shall be replaced in its entirety by this Operating Agreement, which is stated in its entirety as follows:

### ARTICLE I

### NAME AND BUSINESS

**Section 1.01. Name; Formation; Filings**.

    (a)    The name of the Company is Cross Creek Apartments Holdings, LLC.

    (b)    The Managing Member shall from time to time take all actions as are necessary or appropriate to: (i) effectuate and permit the continuation of the Company as a limited liability company under the laws of the State, (ii) enable the Company to do business in the State, and (iii) protect the limited liability of the Members under the laws and regulations of the State, including the preparation and filing of any certificate, document or instrument of the Company as may be required under the laws and regulations of the State. The Members shall execute such certificates, documents and instruments and take such other action as may be necessary to enable the Managing Member to fulfill its responsibilities under this Section 1.01(b).

**Section 1.02. Place of Business**.  (a) The principal office of the Company in the State, wherein there shall be maintained those records required by the Uniform Act to be kept by the Company, shall be located at 325 Ambrose Run, Beaufort, South Carolina, 29902 or at such place or places as the Managing Member may determine.  The Managing Member shall at all times maintain a principal office in the State.

(b)     The registered agent of the Company in the State for service of process is CT Corporation System, 75 Beattie Place, Greenville, South Carolina  29601.

**Section 1.03. Names and Addresses of Members**.  The names and addresses of the Managing Member and the Investor Members are set forth in Exhibit C attached hereto and made a part hereof.

**Section 1.04. Purposes**.  The purposes of the Company are to acquire, finance, own, construct, rehabilitate, maintain, improve, operate, lease and, if appropriate or desirable, sell or otherwise dispose of the Apartment Complex in a manner consistent with the requirements of Section 42 of the Code.  The Company shall engage in no other business or activity.

**Section 1.05. Term and Dissolution**.

(a)     The Company shall continue in full force and effect until December 31, 2060, except that the Company shall be dissolved and its assets liquidated prior to such date upon:

(i)     A sale or other disposition of all or substantially all of the assets of the Company;

(ii)     The Withdrawal of a Managing Member of the Company, if the Company has not been continued pursuant to Section 10.02 hereof or reconstituted pursuant to Section 10.03 hereof;

(iii)     An election to dissolve the Company made in writing by the Managing Member; or

(iv)     An occurrence of any other event which results in a dissolution of the Company pursuant to the Uniform Act.

(b)     Upon dissolution of the Company, the Managing Member (or for purposes of this paragraph, its trustees, receivers or successors) shall cause the cancellation of the Articles of Organization, liquidate the Company Assets in a manner consistent with Section 4.03 hereof and apply and distribute the proceeds thereof in accordance with Section 4.03 hereof.  Notwithstanding the foregoing, if, during the liquidation, the Managing Member shall reasonably determine that an immediate sale of all of the Company Assets would be impermissible, impractical or would cause undue loss to the Members, the Managing Member may either (i) defer liquidation of, and withhold from distribution for a reasonable time, any assets of the Company, except those necessary to

satisfy Company debts and obligations, or (ii) distribute Company Assets to the Members in kind.

**Section 1.06. Title to Apartment Complex.**  Legal title to the Apartment Complex shall, at all times the Company is in existence, be in the name of the Company, and no Member, individually, shall have any ownership interest in the Apartment Complex.

# ARTICLE II

# DEFINITIONS

**Section 2.01. Meanings.**  Capitalized terms used in this Agreement shall have the meanings specified in this Section 2.01.  Certain additional defined terms are set forth elsewhere in this Agreement.  For purposes of this Agreement:

"*Accountants*" means Deloitte LLP, or any other firm or firms of independent certified public accountants as may be engaged by the Managing Member on behalf of the Company from time to time.

"*Accountants' Determination*" means a determination by the Accountants concerning the amount of Credits allocable to the Investor Members (in the aggregate) during the entire Credit Period and/or during any one or more Company Taxable Years during the Credit Period, as reflected in a final version of any Company Tax Return prepared by the Accountants or by a written notice or other communication from the Accountants to the Managing Member.

"*Actual Aggregate Credit Amount*" means the aggregate amount of Credits that, as a result of an Accountants' Determination or a Final Determination, is determined to be allocable to the Investor Members (in the aggregate) during the Credit Period (or any applicable taxable period therein) after taking into account all prior adjustments required to be made pursuant to the provisions of Section 3.05.

"*Additional Adjuster Payment*" shall have the meaning set forth in Article III herein.

"*Admission Date*" means the date as set forth in Section 14.11 hereof.

"*Affiliate*" means, as to any Member, any Person that: (i) directly or indirectly controls or is controlled by (such as any partnership or limited liability company in which the Member, directly or indirectly, serves as a manager or managing member, respectively) or is under common control with the specified Member; (ii) is an officer or director of, commissioner of, partner in, member of or trustee of, or serves in a similar capacity with respect to, the specified Member or of which the specified Member is an officer, director, member, partner or trustee, or with respect to which the specified Member serves in a similar capacity; or (iii) is the beneficial owner, directly or indirectly, of 10% or more of any class of equity securities of the specified Member or of which the

specified Member is directly or indirectly the owner of 10% or more of any class of equity securities. The term "control" (including the term "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"*Agency*" means the South Carolina State Housing Finance and Development Authority, or any successor thereto in its capacity as the agency responsible for administering the Credit program of the State.

"*Agreement*" means this Operating Agreement, including all Exhibits and Schedules hereto, as amended from time to time in accordance with the terms of Section 14.03 hereof.

"*Annual Credit Amount*" means, with respect to any Company Taxable Year during the Credit Period, the amount of Credits allocable to the Investor Members (in the aggregate) during such Company Taxable Year.

"*Apartment Complex*" means the 7 building complex with 144 total apartment units known as Cross Creek Apartments located on approximately 8.3 acres of land located at 325 Ambrose Run, Beaufort, South Carolina (the legal description of which is set forth in Exhibit B), and ancillary and appurtenant facilities and all furnishings, equipment, land, real property and personal property used in connection with the operation thereof.

"*Articles of Organization*" means the Articles of Organization filed by the Company with the Secretary of State of the State.

"*Business Day*" means any day except a Saturday, Sunday or other day on which commercial banks in Omaha, Nebraska are authorized or required by law to close.

"*Capital Account*" shall, with respect to each Member, mean and refer to the separate "book" account for such Member to be established and maintained in all events in accordance with Section 704 of the Code and the Regulations thereunder.

     (i)      Except as otherwise set forth in Article IV hereof to the contrary, a Member's Capital Account shall include generally, without limitation, the Capital Contribution of a Member (as of any particular date), (1) increased by the Member's distributive share of Profits of the Company (including, if such date is not the close of the Company Accounting Year, the distributive share of Profits of the Company for the period from the close of the last Company Accounting Year to such date), and (2) decreased by the Member's distributive share of Losses of the Company and distributions by the Company to such Member (including, if such date is not the close of the Company Accounting Year, the distributive share of Losses of the Company and distributions by the Company during the period from the close of the last Company Accounting Year to such date). For purposes

of the foregoing, distributions of property to a Member shall result in a decrease in such Member's Capital Account equal to the Gross Asset Value, as of the date of distribution, of such property (less the amount of indebtedness, if any, of the Company which is assumed by such Member and/or the amount of indebtedness, if any, to which such property is subject, as of the date of distribution, subject to the provisions of I.R.C. § 7701(g)) distributed by the Company to such Member.

(ii)    In the event that the Capital Contribution of a Member consists of property having a fair market value in excess of its adjusted basis, or in the event the Gross Asset Values of Company Assets are adjusted under and pursuant to clause (ii) of the definition of Gross Asset Value, the Members' Capital Accounts shall be adjusted thereafter in accordance with the provisions of § 1.704-1(b)(2)(iv)(g) of the Regulations with respect to allocations to the Members of Depreciation, gain or loss, as computed for book purposes, and not for tax purposes.

(iii)    In the event that the provisions of § 1.704-1(b)(2)(iv) of the Regulations fail to provide guidance on how adjustments to the Capital Accounts of the Members should be made to reflect particular adjustments to Company capital on the books of the Company, then such Capital Account adjustments shall be made by the Managing Member in its reasonable determination, with the review and concurrence of the Accountants and/or with the advice of the professional tax advisors of the Company, in a manner that (1) maintains equality between (A) the aggregate Capital Accounts of the Members and (B) the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes in accordance with § 1.704-1(b) of the Regulations, (2) is consistent with the underlying economic arrangement among the Members, and (3) is based, wherever practicable, on federal tax accounting principles.

"*Capital Contribution*" means the cash plus the Gross Asset Value (net of liabilities) of other property contributed to the Company by each Member. Any reference in this Agreement to the Capital Contribution of a then Member shall include any Capital Contribution previously made by any prior Member in respect of the Interest of such then Member.

"*Capital Contribution Request*" means a written Capital Contribution Request in the form attached hereto as Exhibit A.

"*Capital Event*" means any transaction the proceeds of which are not includable in Cash Flow, including without limitation, the sale or other disposition of all or any substantial part of the assets of the Company or the refinancing of any Mortgage Loan, but excluding (i) loans to the Company (other than a refinancing of any Mortgage Loan) and (ii) contributions to the capital of the Company by the Members.

"*Cash Flow*" means, for any period of time, the total cash receipts of the Company from ordinary operations (i.e., excluding the proceeds of (A) capital

transactions, (B) the Capital Contributions of the Members, and (C) the proceeds of any loans, other than Operating Deficit Loans), such as, but not limited to, Effective Gross Income plus any other funds (such as any reserves in excess of the amounts required to be established and maintained pursuant to this Agreement, when and to the extent the Managing Member no longer regards such excess reserves as reasonably necessary in the efficient conduct of the business of the Company) deemed available for distribution and designated as Cash Flow by the Managing Member, *less* (i) the total cash disbursements of the Company (such as, but not limited to, operating expenses, costs of repair or restoration of the Apartment Complex, property management fees, financing fees or other requirements of any Lender and interest and principal repayments of any loans, other than loans from the Managing Member or any Affiliate thereof (such as Operating Deficit Loans)), and *less* (ii) amounts paid in connection with the establishment or maintenance of reserves as required by this Agreement.

"*Change in Law*" means an amendment to the Code, Treasury Regulations, a court decision or a ruling of the Service that is applicable to the Apartment Complex and that provides for the reduction or elimination of the Credit for qualified low-income housing projects (as defined in Code Section 42(g)(1)), or otherwise substantially changes the requirements for qualifying for the Credit in a manner which the Members reasonably agree cannot be satisfied by the Company.

"*Closing Date*" means the date of this Agreement, which is the date established by the Managing Member for the admission of the Investor Members.

"*Code*" or "*I.R.C.*" means the Internal Revenue Code of 1986, as amended from time to time, or any successor statute thereto. Reference herein to any Code section shall include any successor provision.

"*Company*" means Cross Creek Apartments Holdings, LLC, a limited liability company formed under and pursuant to the Uniform Act.

"*Company Accounting Year*" means the accounting year of the Company, ending December 31 of each year.

"*Company Assets*" means, at any particular time, the Project and any other assets or property (tangible, intangible, choate or inchoate, fixed or contingent) of the Company.

"*Company Items*" shall have the meaning set forth in Section 4.04(i).

"*Company Tax Return*" means the United States Partnership Income Tax Return (Form 1065) for the Company, together with all Schedules K-1 included therein, and all state and local tax returns and other similar schedules required to be filed with respect to the operations of the Company.

"*Company Taxable Year*" means the taxable year of the Company which shall be the Company Accounting Year or such other taxable period as may be required by the Code or Regulations.

"*Compliance Period*" shall have the meaning set forth in Section 42(i)(1) of the Code.

"*Consent*" means, and will be deemed to have been obtained, if the applicable Member(s) shall have been notified in writing consistent with Section 14.02 of any action either proposed to be taken or for which ratification is desired and if such Member(s) shall have expressly consented in writing to such action. In the event that there is more than one Member, Consent shall be deemed to have been obtained if a majority in Interest of the Members so consents in accordance with the preceding sentence; provided, however, that if pursuant to the Uniform Act, the consent of all Members is required in a given context, then the term Consent of the Member shall be deemed to require the consent of all Members. The Members agree to use reasonable efforts to respond in writing within 15 Business Days of receipt of a notice from a Member requesting the Consent of the other Members.

"*Cost Certification*" means the final certification by the Accountants of the costs incurred in connection with the construction of the Apartment Complex, as submitted to and approved by the Agency.

"*Credit*" means the low income housing tax credit allowable to the Company pursuant to Section 42 of the Code.

"*Credit Adjuster Advance*" shall have the meaning set forth in Article III herein.

"*Credit Adjuster Distribution*" shall have the meaning set forth in Article III herein.

"*Credit Adjustment Payments*" means Current Adjuster Payments, Additional Adjuster Payments, and any other payments required to be made by the Managing Member to the Investor Members pursuant to the provisions of Section 3.05 to compensate the Investor Members (in the aggregate) for a loss of Credits that are projected to be available to the Investor Members (in the aggregate).

"*Credit Commencement Date*" means, with respect to any Building, the date on which such Building has been "placed in service" and otherwise is eligible for the Credits.

"*Credit Determination Date*" means the date on which the aggregate amount of Credits allocable to the Investor Members during the Credit Period is determined by the Accountants and the Managing Member and is reflected in a Company Tax Return filed with the Service.

"*Credit Period*" means the credit period as defined in Section 42(f)(1) of the Code.

"*Credit Shortfall*" shall have the meaning set forth in Article III herein.

"*Credit Shortfall Adjustment Amount*" shall have the meaning set forth in Article III herein.

"*Credit Sum*" shall have the meaning set forth in the definition of Projected Annual Credit Amount.

"*Current Adjuster Payment*" shall have the meaning set forth in Article III herein.

"*Depreciation*" means, for purposes of maintaining Capital Accounts and not for purposes of calculating taxable income, for each Company Accounting Year or other period, with respect to Company Assets, an amount that bears the same ratio to the Gross Asset Values of Company Assets as the federal income tax depreciation, amortization, or other cost recovery deductions for such Company Assets for such year or other period bears to the adjusted tax bases of such assets, appropriately adjusted for any adjustments to the tax bases of such assets which occur from time to time during such year or other period.

"*Disposition*" (including the verb form "*Dispose*" and the adjective form "*Disposing*") means, as to a Member, the assignment, sale, transfer, exchange, pledge, hypothecation or other disposition of all or any part of its Interest.

"*Effective Gross Income*" means, for any period of time, all rental and other incidental income received (on a cash basis) by the Company, including, without limitation, any rent subsidies, to the extent available, forfeited deposits, rental loss insurance proceeds, application fees, late payments and proceeds from laundry facilities and vending machines.

"*Entity*" means any general partnership, limited partnership, corporation, joint venture, trust, business trust, cooperative, association, limited liability company or the State or any agency or political subdivision thereof.

"*Event of Bankruptcy*" means, with respect to any Person: (i) the entry of a decree or order for relief by a court having jurisdiction in respect of such Person in a case under the Federal bankruptcy laws, as now or hereafter constituted, or any other similar law, or the issuance of an order for the winding-up or liquidation of such Person's affairs and the continuance of any such decree or order unstayed and in effect for a period of 30 consecutive days, or (ii) the commencement by such Person of a proceeding under any reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect, or (iii) the commencement against such Person of any such proceeding which remains undismissed for a period of 30 days, or any act by such Person which indicates such Person's consent to, approval of or acquiescence in any such proceeding or the appointment of any

receiver of or trustee for such Person or of any substantial part of such Person's property, or allows any such receivership or trusteeship to continue undischarged for a period of 30 days, or (iv) the taking of any action by such Person to authorize any of the foregoing, or (v) the making of an assignment for the benefit of creditors by such Person, or (vi) such Person files a petition in bankruptcy or petitions or applies to any tribunal for any receiver of such Person or for any substantial part of any Person's property, or (vii) if either (a) any one or more judgments or orders against any Person with respect to a claim or claims involving in the aggregate liabilities exceeding $50,000, which judgment or order is not covered in full by insurance or are not stayed, bonded, paid or discharged within 45 days after such judgment or order or (b) any writ of attachment or execution or any similar process is (I) issued or levied against such Person's property and (II) is not discharged or stayed within 45 days thereof.

"*Extended Use Agreement*" shall mean an agreement between the Agency and the Company pursuant to Section 42(h)(6) of the Code in which the Company agrees to maintain the Apartment Complex for occupants who meet the income requirements under Code Section 42(g) and to maintain the Apartment Complex as "rent-restricted" under Code Section 42(g) for a certain period of time set forth in the Extended Use Agreement, subject to certain exceptions set forth therein.

"*Filing Office*" means the Office of the Department of Financial Institutions.

"*Final Determination*" means the earliest to occur of (i) the date on which a decision, judgment, decree or other order has been issued by any court of competent jurisdiction or government agency with regard to any tax or other issue affecting the Company, which decision, judgment, decree or other order has become final (i.e., all allowable appeals requested by the parties to the action have been exhausted), or (ii) the date on which the Service has entered into a binding agreement with the Company with respect to such issues or has reached a final administrative or judicial determination with respect to such issues which, whether by law or agreement, is not subject to appeal.

"*Gross Asset Value*" means the following, with respect to any Company Asset:

     (i)     The initial Gross Asset Value of any Company Asset at the time that it is contributed by a Member to the capital of the Company shall be an amount equal to the gross fair market value of such Company Asset (without regard to the provisions of I.R.C. Section 7701(g)), as determined by the contributing Member and the Company.

     (ii)     The Gross Asset Values of all Company Assets may be adjusted, as reasonably determined by the Managing Member, to equal their respective fair market values taking Code Section 7701(g) into account (A) in connection with the contribution of money or other property (other than a *de minimis* amount) to the Company by a new or existing Member as consideration for an Interest in the Company or (B) in connection with the liquidation of the Company or the distribution by the Company of more than a *de minimis* amount of Company

Assets or money to a retiring or continuing Member as consideration for an Interest in the Company or in any other circumstances set forth in § 1.704-1(b)(2)(iv)(f)(5) of the Regulations or in any successor regulations.

(iii)    The Gross Asset Values of all Company Assets shall be adjusted, as reasonably determined by the Managing Member, to equal the respective fair market values of the Company Assets upon the termination of the Company for federal income tax purposes pursuant to I.R.C. Section 708(b)(1)(B).

"*Guarantor*" means, Farnam Capital Advisors, L.L.C. and any successors thereto as parties pursuant to the Guaranty.

"*Guaranty*" means the Guaranty executed by Guarantor for the benefit of the Investor Members.

"*Initial Aggregate Credit Amount*" means the aggregate amount of Credits that is determined by the Accountants and the Managing Member, on or before the Credit Determination Date, to be allocable to the Investor Member.

"*Installment(s)*" shall have the meaning set forth in Section 3.03(a).

"*Interest*" means the entire interest of a Member in the Company at any particular time, including the right of such Member to any and all benefits to which a Member may be entitled as provided in this Agreement and the obligations of such Member to comply with the terms of this Agreement.

"*Investor Member*" means individually, or collectively (where applicable), each of Thomas J. Rasmussen, Daniel Stechschulte and Mark Rasmussen, any Person or Persons who, at the time of reference thereto, have been admitted as additional or successor Members.

"*Laws*" means any statute, rule, ordinance, regulation, order, judgment, award or decree of any governmental authority, including, but not limited to, ERISA, the Resource Conservation and Recovery Act, the Comprehensive Environmental Response, Compensation and Liability Act, the Clean Water Act, the Clean Air Act, the Occupational Safety and Health Act, and the Americans with Disabilities Act of 1990, in each case, as amended.

"*Lender*" means any lender or its successors and assigns making a loan to the Company that is secured by a Mortgage.

"*Lien*" means any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance (including, without limitation, any easement, right-of-way, zoning or similar restriction or title defect), lien (statutory or other) or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title

retention agreement, any financing lease having substantially the same economic effect as any of the foregoing and the filing of any financing statement under the UCC or comparable law of any jurisdiction).

"*Management Agent*" means America First Properties Management and/or any successor or assign who is selected by the Managing Member to provide management services with respect to the Apartment Complex from time to time in accordance with Article XI hereof.

"*Management Agreement*" means the Management Agreement between the Company and the Management Agent in connection with the management of the Apartment Complex.

"*Managing Member*" means Foundation for Affordable Housing, a Nebraska non-profit corporation, and any Person or Persons who, at the time of reference thereto, have been admitted as additional or successor Managing Members, in each such Person's capacity as a Member of the Company. At any time when there is more than one Managing Member, the term "Managing Member" or "Managing Members" shall include, collectively, all such Persons, unless the context clearly implies that such term only refers to one of them.

"*Members*" means any of, or all of, or any combination of the Managing Member and the Investor Members.

"*Minimum Gain*" means, with respect to each Member, the amount computed in accordance with § 1.704-2(g) of the Regulations. The Company shall separately compute each Member's share of Minimum Gain attributable to Member nonrecourse debt pursuant to § 1.704-2(i) of the Regulations.

"*Mortgage*" means any mortgage or deed of trust securing a Mortgage Loan and encumbering the Apartment Complex, as such indebtedness may be increased, decreased or refinanced in accordance with this Agreement and the Project Documents. Where the context permits, the term "Mortgage" shall include any mortgage, deed, deed of trust, note, regulatory agreement, security agreement, assumption agreement or other instrument executed in connection with a Mortgage Note which is binding on the Company; and in case any Mortgage is replaced or supplemented by any subsequent mortgage or mortgages, the "Mortgage" shall refer to any such subsequent mortgage or mortgages.

"*Mortgage Loan*" means a loan to the Company evidenced by a Mortgage Note and secured by a Mortgage.

"*Mortgage Note*" means the promissory note executed or to be executed by the Company in favor of any Lender to evidence the indebtedness incurred by the Company in connection a Mortgage Loan.

"*Net Operating Income*" has the meaning set forth in the definition of Debt Service Coverage Ratio.

"*Net Proceeds*" means the difference between (A) the sum of (i) the gross proceeds from a Capital Event other than a refinancing; (ii) the excess proceeds from the refinancing of any loan on the Apartment Complex (that is, any refinancing proceeds not needed for the repayment of the loan refinanced); and (iii) the receipt of any proceeds from insurance settlements or other claims attributable to fire or other casualty, or from condemnation, sales or grants of easements, rights-of-way or the like in excess of those needed for repair, restoration or replacement of the damaged, destroyed or condemned property and (B) the payment of or due provision for (i) all liabilities to creditors of the Company (excluding, except in the event of the dissolution and liquidation of the Company, fees owed to the Managing Member and loans to the Company from the Managing Member or Affiliates thereof for any purpose, including, without limitation, Operating Deficit Loans) and (ii) necessary and customary expenses of such Capital Event or refinancing (other than, except in the event of the dissolution and liquidation of the Company, expenses payable to the Managing Member or an Affiliate thereof).

"*Operating Deficit*" shall mean the amount by which (i) the amount of funds available to the Company from Effective Gross Income of the Apartment Complex, *together with* other available cash and funds on hand of the Company, if any, for the relevant time period *but excluding*: (a) funds from Capital Contributions (except to the extent that Capital Contribution proceeds are specified in the development budget as available to fund initial working capital amounts), (b) the proceeds of any loans obtained by the Company (except for Operating Deficit Loans), (c) advance rent payments and (d) nonforfeited tenant deposits, is less than (ii) the amount necessary to meet all of the operating costs and expenses of any type due and payable for such time period incidental to the operation and business activities of the Company, including, without limitation, debt service payments due under the Mortgage Loans (other than amounts owed under a Mortgage Loan the nonpayment of which is not an event of default thereunder), taxes, insurance, costs of operations, maintenance, repairs, interest, management expenses, prepaid expenses and reserve funding and maintenance requirements set forth herein (if any), but excluding repayment of any loans from the Managing Member or Affiliates thereof, distributions of Cash Flow to Members and amounts expended for capital improvements and similar items.

"*Operating Deficit Loan*" means any loan or loans made to the Company pursuant to Section 6.12 hereof.

"*Permitted Liens*" means liens for taxes, assessments or governmental charges not delinquent or being diligently contested in good faith and by appropriate proceedings and for which adequate reserves in accordance with generally accepted accounting principles consistently applied are maintained on Company's books, and liens, restrictions and encumbrances listed in the Title Policy and title insurance commitment accepted by the Lender.

"*Person*" means any individual or Entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such individual or Entity as the context may require.

"*Profits and Losses*" means, subject to the adjustments in Sections 4.04 through 4.06, for each calendar year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with I.R.C. § 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to I.R.C. § 703(a)(1) shall be included in taxable income or loss), with the following adjustments to be made solely for purposes of maintaining Capital Accounts and not for determining taxable income or loss:

       (i)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

       (ii)    Any expenditures of the Company described in I.R.C. § 705(a)(2)(B) or treated as I.R.C. § 705(a)(2)(B) expenditures pursuant to § 1.704-l(b)(2)(iv)(i) of the Regulations, and not otherwise taken into account in computing Profits or Losses pursuant to this definition, shall be subtracted from such taxable income or loss;

       (iii)    In the event the Gross Asset Value of any Company Asset is adjusted pursuant to clause (ii) or (iii) of the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as hypothetical gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

       (iv)    Gain or loss resulting from any disposition of any asset of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value; and

       (v)    In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there shall be taken into account Depreciation for such calendar year or other period.

"*Project Documents*" means the Mortgage, the Mortgage Note, the Operating Agreement, the Guaranty, the Extended Use Agreement, the Management Agreement and any other material documents related to the acquisition, development, construction, financing, operation or contemplated use of the Apartment Complex, as such documents may be amended from time to time in accordance with the terms of this Agreement.

"*Projected Aggregate Credit Amount*" means the aggregate amount of Credits to be allocable to the Investor Members (in the aggregate) during the Credit Period (or any taxable period therein). If, on or after the Credit Determination Date, the aggregate

amount of Credits allocable to the Investor Members (in the aggregate) is determined to be different than as anticipated, the term "Projected Aggregate Credit Amount," as used herein, shall mean such revised aggregate amount, provided that any adjustments, payments, or distributions required under the provisions of this Agreement to be made on account of any such prior determination have in fact been made.

"*Projected Annual Credit Amount*" means, with respect to any Company Taxable Year during the Credit Period, the amount of Credits projected to be allocable to the Investor Member during such Company Taxable Year. It is currently anticipated that the Company will allocate Credits to the Investor Members (in the aggregate) in the amount of $250,500 in each of the following Company Taxable Years: 2010 through 2019 (inclusive). If, on or after the Credit Determination Date, the amount of Credits allocable to the Investor Members (in the aggregate) during any Company Taxable Year is determined to be different than as anticipated herein, the term "Projected Annual Credit Amount," as used herein, shall mean such revised amount, provided that any adjustments, payments, or distributions required under the provisions of this Agreement to be made on account of any such prior determination have in fact been made.

"*Qualified Investments*" means any of the following if and to the extent permitted by law: (i) direct obligations of or obligations the principal of and interest on which are guaranteed by the United States Government; or (ii) obligations of any agency or instrumentality of the United States Government backed by the full faith and credit of the United States; or (iii) demand and savings deposits at commercial banks and savings and loan associations, provided that the entire deposit is insured by the Federal Deposit Insurance Corporation ("FDIC"); or (iv) certificates of deposit issued by any state or national bank which has combined capital, surplus, and undivided profits of not less than $50,000,000, or any savings and loan institution having combined capital, surplus, and retained earnings of not less than $100,000,000, provided that all such investments are fully insured by the FDIC or fully secured by investments described in (i) or (ii); or (v) repurchase agreements or time deposits with banks or trust companies organized under the laws of the United States or any state or the District of Columbia having combined capital, surplus, and undivided profits of not less than $50,000,000 or any of its affiliates, provided that all such investments shall be fully insured by FDIC or fully secured by investments described in (i) or (ii) above which have a fair market value equal to 103% of the face amount of the repurchase agreement plus an amount equal to the amount by which the anticipated interest earnings under the arrangement exceed interest which would have been earned at a rate of 6% per year, provided that the party investing in any repurchase agreement shall receive a perfected security interest, whether by delivery or by registration on a book-entry account of a Federal Reserve Bank, in the underlying obligations subject to such repurchase agreement; or (vi) shares of registered investment management companies investing exclusively in the foregoing.

"*Qualified Tenant*" means a tenant (i) with income on the date of initial occupancy of such tenant's unit not exceeding that permitted by the minimum set-aside test pursuant to Code Section 42(g)(1) who leases a low-income unit in the Apartment Complex under a lease having an original term of not less than six months at a rent which

satisfies the rent restriction test under Code Section 42(g)(2) and (ii) complying with any other requirements imposed by the Project Documents.

"*Regulations*" means the Income Tax Regulations promulgated under the Code, as amended and in effect from time to time.

"*Service*" shall mean the Internal Revenue Service.

"*Special Tax Counsel*" means Kutak Rock LLP, 1650 Farnam Street, Omaha, Nebraska 68102-2186, or such other law firm which shall be selected by the Managing Member.

"*State*" means the State of South Carolina.

"*Substituted Investor Member*" means any Person who is admitted to the Company as a successor Investor Member pursuant to Section 9.01 hereof.

"*Tax*" or "*Taxes*" means any and all liabilities, losses, expenses and costs that are, or are in the nature of, taxes, fees or other governmental charges, including interest, penalties, fines and additions to tax imposed by the Service or any other taxing authority.

"*Tax Matters Member*" means the Managing Member, in its capacity as Managing Member of the Company.

"*Title Insurer*" means Chicago Title Insurance Company.

"*Title Policy*" means the title policy provided to the Company from the Title Insurer.

"*Uniform Act*" means the South Carolina Limited Liability Company Act or any corresponding provision or provisions of succeeding law as it or they may be amended from time to time as adopted by the State.

"*Withdrawal*" (including the verb form "*Withdraw*" and the adjective form "*Withdrawing*" or "*Withdrawn*") means, as to a Managing Member, the occurrence of death, adjudication of insanity or incompetence, Event of Bankruptcy, dissolution, liquidation, or voluntary or involuntary withdrawal or retirement from the Company for any reason, including whenever a Managing Member may no longer continue as a Managing Member by law or pursuant to any terms of this Agreement. Withdrawal shall also mean the sale, assignment, transfer or encumbrance (other than to a Lender) by a Managing Member of its interest as a Managing Member. A Managing Member which is a corporation, limited liability company or partnership shall be deemed to have sold, assigned, transferred or encumbered its interest as a Managing Member in the event (as a result of one or more transactions) of any sale, assignment or other transfer (but specifically excluding any transfer occurring pursuant to the laws of descent and distribution) of a controlling interest in a corporate Managing Member or of a controlling

membership interest or manager interest in a Managing Member that is a limited liability company or of a Managing Member interest in a Managing Member which is a partnership. For purposes of this definition of *Withdrawal*, "controlling interest" shall mean the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise. However, dissolution of any Managing Member which is a partnership shall not be deemed a Withdrawal unless there is a termination and winding up of the business of such partnership.

**Section 2.02. Pronouns and Plurals**. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the Person or persons may require. Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder," when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

## ARTICLE III

## CAPITAL

**Section 3.01. Capital Contribution of Managing Member**. The Managing Member has contributed or will contribute in cash to the Company the Capital Contribution set forth in Exhibit C. Notwithstanding anything to the contrary in this or any prior agreement, the parties hereto agree and acknowledge that the amount reflected in Exhibit C represents the value of all property and other contributions by the Managing Member to the Company as of this date (assuming cash contributions have been made in accordance with the preceding sentence) and such amount shall represent the initial Capital Account of the Managing Member in the Company.

**Section 3.02. Admission of Investor Members**. The Investor Members are hereby admitted to the Company as Members as of the Admission Date and shall have the Interest specified on Exhibit C attached hereto.

**Section 3.03. Capital Contribution of Investor Members**.

(a)     Subject to the terms and provisions of this Agreement, each Investor Member shall be obligated to make Capital Contributions to the Company as set forth herein. It is anticipated that the Investor Members will each provide a Capital Contribution to the Company on the Admission Date in the amount of $187,500. Thereafter, each Investor Member shall be required to make the following Installments of equity at the following times (subject to their continued ownership of an Interest in the Company): (i) $237,500 on or around December 31, 2012 and (ii) $316,600 on or around December 31, 2015.

The Investor Members shall fund each Capital Contribution Installment within twenty (20) days of its receipt of a Capital Contribution Request (in the form provided in Exhibit A hereto.

(b)    If the Investor Member disputes that all or a portion of any Installment is due and payable in accordance with this Agreement, then, until there has been a finding or determination of such issue against the position of the Investor Member, the Investor Member shall not be required to make such Installment (or portion thereof) in dispute to the Company (and no default under Section 3.03 or 3.04 shall be deemed to occur unless and until the required payment, plus interest at 10% per annum, from the date of such determination was made, is not made within five (5) Business Days of such of such determination).  The non-prevailing party on such issue shall be liable, responsible and accountable to the prevailing party for any cost or expense (including reasonable attorneys' fees) incurred with respect to such proceeding.

From and after the date of the occurrence of an Event of Bankruptcy with respect to the Company, the Managing Member or any Guarantor, the obligation of the Investor Member to make any further Capital Contributions shall be suspended until such time as (i) the Event of Bankruptcy shall have been cured in a manner approved in writing by the Investor Member or (ii) a financially responsible party acceptable to the Investor Member shall have agreed to become the Managing Member (or Guarantor) and to assume and to perform all of the duties and obligations of the bankrupt Managing Member (or Guarantor) under this Agreement and the Project Documents (or, with respect to a new Guarantor, all duties and obligations under any applicable Guaranty).

Payments of the Capital Contribution Installments shall be secured by a security interest in each of the Investor Member's Interests granted to the Company upon the admission of such Investor Member.  In connection with the grant to the Company by the Investor Member of a security interest in the Investor Member's Interest, the Investor Member shall, upon request, permit the Company to execute on behalf of the Investor Member a financing statement (the "Form UCC-1") which describes the security interest of the secured party in the Investor Member's Interest.  The Form UCC-1 may be filed by the secured party in the state and/or county of domicile of the Investor Member and in the State in order to perfect the interest of the secured party in the collateral and protect the secured party against claims asserted by third parties against the Investor Member.

(c)    Except as provided in the Act or in Section 4.03 hereof, after its Capital Contribution shall be fully paid hereunder, no Investor Member shall be required to make any additional Capital Contribution to the Company or be liable for any debts, liabilities, contracts or obligations of the Company.

**Section 3.04.  Default**.

(a)    If any Investor Member does not pay an Installment when due and payable pursuant to Section 3.03, it will be deemed to be in default under this section and interest on any unpaid amount shall accrue, from the date on which such Installment was due and payable to the date on which such default is cured as provided below, at the lesser of (i) 10% per annum, compounded annually, or (ii) the maximum interest rate permitted by law.

(b)     The Managing Member shall promptly give notice of a default to the defaulting Investor Member. A default may be cured by payment to the Company of the Installment (and any accrued interest) due within 10 days of receipt of the notice of default.

(c)     In the event that the defaulting Investor Member does not cure any default described in this Section 3.04, then the Company may, after providing to the defaulting Investor Member the notice of the default referred to in Section 3.04(b) and the cure period provided in Section 3.04(b) and any notice required by applicable law, exercise its rights with respect to the security interest granted in the defaulting Investor Member's Interest and sell such Interest to a third party (including an existing Member) by public or private sale at whatever price and on whatever terms are commercially reasonable. Upon such sale of a defaulting Investor Member's Interest, the Managing Member may admit the purchaser of such Interest as a Substituted Investor Member. Upon such an admission, the defaulting Investor Member shall cease to be an Investor Member but shall continue to be liable to the Company if and to the extent that the proceeds of sale of the defaulting Investor Member's Interest are less than the sum of (i) the unpaid balance of all amounts due at whatever time from the defaulting Investor Member and (ii) all reasonable collection and sales expenses incurred by the Company or the Managing Member, including fees and disbursements of counsel.

**Section 3.05.  Credit Adjuster Distributions and Credit Adjustment Payments to the Investor Member**.

(a)     If at any time prior to the Credit Determination Date the Initial Aggregate Credit Amount is determined by an Accountant's Determination to be less than Projected Aggregate Credit Amount (the amount of such shortfall being referred to herein as a "Credit Shortfall"), the Managing Member shall make a Capital Contribution to the Company in an amount equal to the product of (i) the Credit Shortfall and (ii) $0.80 during the tax years 2010, 2011 and 2012 and $.95 during all tax years thereafter (the "Credit Shortfall Adjustment Amount"); with any such Capital Contribution being referred to herein as a "Credit Adjuster Advance". The Company immediately shall distribute the proceeds of any such Credit Adjuster Advance to the Investor Members (any such distribution being referred to herein as a "Credit Adjuster Distribution"). Any Credit Adjuster Advance or Credit Adjuster Distribution required to be made pursuant to the provisions of this Section 3.05(a) shall be made within 20 calendar days following the earlier of (i) the date on which the Accountants deliver the final version of the Company's Tax Return for the year to the Managing Member in which a Credit Shortfall exists, (ii) if applicable, a Final Determination relating to a shortfall in Eligible Basis that confirms the existence of a Credit Shortfall, or (iii) December 31, 2011. No payments, contributions, or distributions shall be required to be made pursuant to the provisions of this Section 3.05(a) merely as a result of unanticipated delays by the Company in leasing Apartment Complex units to Qualified Tenants.

(b)    (i)    If at any time (A) there is an Accountants' Determination or a Final Determination that all or a portion of the Credits expected to be claimed with respect to such current Company Taxable Year and/or all or a portion of the Credits claimed with respect to a prior Company Taxable Year is disallowed or is subject to recapture pursuant to the provisions of Section 42(j) of the Code for a reason other than a transfer of limited liability company interests in the Company or a Change in Law, or if the amount of any Credit allocated annually is less than the Projected Annual Credit Amount for such year(s), the Managing Member shall make a payment (in the aggregate) to the Investor Members (such payment being referred to herein as the "Current Adjuster Payment") within 20 calendar days following the earlier of the Accountants' Determination or the Final Determination, as the case may be, in an amount that is equal to the sum of (A) the amount of Credit that was disallowed or recaptured or allocated in an amount less than the Projected Annual Credit Amount with respect to the current Company Taxable Year and all prior Company Taxable Years, plus (B) the amount of any interest and penalties imposed by the Service solely as a result of the disallowance or recapture of Credit with respect to the Company.

(ii)    In the event of an Accountants' Determination or Final Determination on or after the Credit Determination Date that the Actual Aggregate Credit Amount is less than the Projected Aggregate Credit Amount due to a reduction in the Eligible Basis of the Apartment Complex and that the Credits allocable to the Investor Members (in the aggregate) also will be reduced or disallowed in all subsequent years of the Credit Period, the Managing Member shall make a payment to the Investor Member (such payment being referred to herein as an "Additional Adjuster Payment"), within 20 calendar days following the earlier of such Accountants' Determination or Final Determination, as the case may be, in an additional amount (i.e., in addition to the Current Adjuster Payment paid pursuant to the provisions of Section 3.05(b)(i) hereof) equal to the product of (A) $0.80 during the tax years 2010, 2011 and 2012 and $.95 during all tax years thereafter multiplied by (B) an amount equal to the difference between the Projected Aggregate Credit Amount for all subsequent years of the Credit Period and the Actual Aggregate Credit Amount for all such subsequent years of the Credit Period as a result of such Final Determination or Accountants' Determination.

(iii)    Notwithstanding the foregoing, in the event of an Accountants' Determination or Final Determination that all or a portion of the Credits previously allocated to the Investor Members (in the aggregate) on a Company Tax Return is subject to recapture or disallowance for a reason other than a shortfall in Eligible Basis, only the Current Adjuster Payment will be due in the year of such Accountants' Determination or Final Determination (referred to herein as a "Determination Year"), and no Additional Adjuster Payment with respect to future years of the Credit Period will be due and payable in the Determination Year; instead, the amount of Credits allocable to the Investor Member during each subsequent Company Taxable Year during the Credit Period shall be determined upon the close of each such subsequent Company Taxable

Year and if, for any such subsequent Company Taxable Year, the Annual Credit Amount is determined to be less than the Projected Annual Credit Amount, the Managing Member shall make a Credit Adjustment Payment to the Investor Member within 20 calendar days following the earlier of the Accountants' Determination or Final Determination in an amount that is equal to the amount by which the Annual Credit Amount for such subsequent Company Taxable Year is less than the Projected Annual Credit Amount.

(c)     Any Credit Adjustment Payment required to be made by a Managing Member pursuant to Sections 3.05(a) or 3.05(b) shall constitute the recourse obligation of such Managing Member. Except as provided below, any such Credit Adjustment Payment shall be paid in its entirety by such Managing Member to the Investor Members (in the aggregate), as a payment of damages for breach of warranty, regardless of the reason for the occurrence of such event, and such payment shall not be considered a Capital Contribution, loan or other amount reimbursable to any Managing Member. Credit Adjuster Distributions and Credit Adjustment Payments (or any other adjustment payment required to be made by a Managing Member pursuant to either Section 3.05(d) or (e)) that are solely attributable to a Change in Law shall be treated as current distributions of cash by the Company to the Investor Member in accordance with the provisions of Section 731 of the Code and shall be solely payable from available Cash Flow and/or Net Proceeds pursuant to Article IV herein. To the extent that any Credit Adjuster Distribution or Credit Adjustment Payment required to be made under Section 3.05 is not made when due, the unpaid amount thereof shall bear interest at a rate equal to the lesser of (i) 10% per annum, compounded monthly, or (ii) the maximum interest rate permitted by law.

(d)     Notwithstanding anything to the contrary in this Agreement, the Managing Member shall not be responsible for the Investor Member's inability to fully utilize Credits allocated to it. In addition, notwithstanding anything to the contrary herein, no Credit Adjuster Distributions or Credit Adjustment Payment shall be owed pursuant to Section 3.05 unless the amount of such payment, when combined with all prior Credit Adjuster Distribution or Credit Adjustment Payments that but for this sentence would have been required, exceeds $2,500. In addition, notwithstanding anything to the contrary herein, to the extent any Credit Adjuster Distribution or Credit Adjustment Payment owed to the Investor Member is solely attributable to a Change in Law, then such portion of the Credit Adjuster Distribution or Credit Adjustment Payment shall only be payable to the Investor Member from available Cash Flow or Net Proceeds pursuant to Article IV herein.

**Section 3.06. No Interest on Capital Contribution; Return of Capital**. Except as provided in Section 3.05, no Member shall be entitled to receive any interest on its Capital Contribution. Except as provided in Section 3.05 or as otherwise specifically provided elsewhere herein, no Member shall have the right to withdraw its Capital Contribution or to demand and receive property of the Company in return for its Capital Contribution, nor shall any Investor Member have any right to demand or receive property other than money upon dissolution and termination of the Company.

**Section 3.07. No Third-party Beneficiary**. None of the provisions of this Agreement shall be construed as existing for the benefit of any creditor of the Company or for the benefit of any creditor of any of the Members, and no such provision shall be enforceable by a party not a signatory to this Agreement, except where granting of a security interest or pledge has been made by the Company.

## ARTICLE IV

## PROFITS AND LOSSES; DISTRIBUTIONS; CAPITAL ACCOUNTS

**Section 4.01. Profits, Losses and Credits**.

(a)     Subject to Section 4.04 hereof, all Profits, Losses and Credits incurred or accrued after the Admission Date, other than those arising from a Capital Event, shall be allocated 99% to the Investor Member and 1.0% to the Managing Member.

(b)     Subject to Section 4.04 hereof, all Profits and Losses arising from a Capital Event shall be allocated among the Members as follows:

*As to Profits*:

(i)     First, an amount of Profits shall be allocated to the Members who have negative Capital Account balances (prior to taking into account the Capital Event) in proportion to the amount of such balances until all such Capital Accounts shall have a zero balance;

(ii)     Second, thereafter, an amount of Profits shall be allocated to each of the Members until the positive balance in the Capital Account of each Member equals the amount of cash which would be distributed to such Member if such Profits were cash available to be distributed in accordance with the provisions of subsection (iii) of Section 4.02(b).

*As to Losses*:

(i)     First, an amount of Losses equal to the aggregate positive balances (if any) in the Capital Accounts of all Members then having positive balance Capital Accounts shall be allocated to such Members in proportion to their positive Capital Account balances until all such Capital Accounts shall have a zero balance; provided, however, that if the amount of Losses to be allocated is less than the sum of the positive balances in the Capital Accounts of those Members having positive balances in their Capital Accounts, then such Losses shall be allocated first to any Managing Member with a positive Capital Account until its Capital Account has a zero balance, with any remainder allocated to the Investor Member; and

(ii)     Second, the balance of any such Losses shall be allocated to the Managing Member.

**Section 4.02. Cash Distributions Prior to Dissolution**.

(a)     ***Cash Flow***.  Provided that all reserves have been funded and maintained as required herein, Cash Flow, if available with respect to any Company Accounting Year, shall be applied or distributed annually, within 60 days after the end of the Company Accounting Year (but in no event earlier than the filing of a Company Tax Return for such year),

(i)     First, to the payment of any Operating Deficit Loans with any such payment to be applied first to accrued but unpaid interest and then to principal; and

(ii)     Second, the balance shall be distributed 95.00% to the Managing Member and 5.0% to the Investor Members (in the aggregate).

(b)     ***Distributions of Net Proceeds***.  Prior to dissolution of the Company, if the Managing Member shall determine from time to time that Net Proceeds are available for distribution from a Capital Event, such Net Proceeds shall be applied or distributed as follows:

(i)     First, to fund reserves for contingent liabilities to the extent deemed reasonable by the Managing Member and Consented to by the Investor Member;

(ii)     Second, to the payment of any outstanding loan from the Managing Member or its affiliates (if any), and then to the payment of any Operating Deficit Loans, with any such payments to be applied first to accrued but unpaid interest and second to principal and then;

(iii)     Third, the balance shall be distributed 50.00% to the Managing Member and 50.0% to the Investor Members (in the aggregate).

**Section 4.03. Termination Distributions**.  (a) Upon dissolution and termination of the Company, after payment of, or adequate provision for, the debts and obligations of the Company, including fees and interest owed to the Members (including for this purpose the amounts, if any, owed pursuant to Section 4.02(a)(i), the payment of which pursuant to this Section shall not result in a charge to the recipient's Capital Account and the parties hereto agree that such amounts shall be paid prior to the payment of any debts, obligations and/or fees owed to the Managing Member or any Affiliate thereof), the remaining assets of the Company (or the proceeds of sales or other dispositions in liquidation of the Company Assets, as may be determined by the remaining or surviving Managing Member) shall be distributed pro rata to the Members in accordance with their respective positive Capital Account balances after taking into account all Capital Account adjustments for the year.  Upon the dissolution and termination of the Company, no Member shall be obligated to restore any deficit balance in its Capital Account. The parties hereto agree that the Investor Member shall have the right (exercisable in its sole

discretion) at any time, upon giving written notice to the Managing Member, to create a deficit restoration obligation and/or to extend the years in which it may be obligated to restore any deficit balance in its Capital Account. Deficit Capital Account restoration payments shall be made by the end of such taxable year (or, if later, within 90 days after the date of such liquidation) and shall, upon liquidation of the Company, be paid, first, to recourse creditors of the Company and, thereafter, distributed to other Members in accordance with the positive balances in their Capital Accounts. Liquidation distributions shall be made by the end of the taxable year in which the liquidation occurs or, if later, within 90 days after the date of liquidation.

Section 4.04. **Special Allocations**. Notwithstanding anything to the contrary contained in this Agreement:

(a)    In the event that there is a net decrease in Company minimum gain (as defined in Regulation § 1.704-2(d) during a fiscal year or period, all Members shall be allocated, before any other allocation is made of the Company items for such year or period, items of income and gain for such year or period (and, if necessary, subsequent years) in the manner and to the extent required by Regulation § 1.704-2(f). The allocations contained in this Section 4.04(a) are intended to be a "minimum gain chargeback" within the meaning of Regulation § 1.704-2(f) and shall be interpreted consistently therewith.

(b)    Subject to the provisions of paragraph (a) of this Section 4.04, (i) any partner nonrecourse deduction (as defined in Regulation § 1.704-2(i)(2)) shall be allocated in the manner specified in Regulation § 1.704-2(i) and (ii) if there is a net decrease during a taxable year of the Company in the minimum gain attributable to partner nonrecourse debt, then items of Company income and gain for such year (and, if necessary, for subsequent years) shall be allocated in the manner and to the extent required by Regulation § 1.704-2(i)(4).

(c)    Subject to the provisions of paragraphs (a) and (b) of this Section 4.04, in the event that a Member unexpectedly receives any adjustments, allocations or distributions described in Regulation § 1.704-1(b)(2)(ii)(d)(4), (5) or (6) as a result of which the negative Capital Account balance of the Member exceeds the sum of such Member's share of minimum gain and the amount of its negative Capital Account that it has agreed to restore or is deemed to be obligated to restore pursuant to Regulations §§ 1.704-2(g)(1) and 1.704-2(i)(5), items of Company income and gain shall be specially allocated to such Member in the manner and to the extent required by such Regulation. This Section 4.04(c) is intended to be a "qualified income offset" within the meaning of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

(d)    (i)    If the balance in the Capital Account of a Member is less than zero, net loss shall be allocated to such Member only to the extent that (y) the sum of the Minimum Gain of such Member (determined in accordance with the provisions of § 1.704-2(g) of the Regulations) plus the amount of its negative Capital Account that

such Member has agreed to restore exceeds (z) the deficit balance in the Capital Account of such Member (determined at the end of the Company Taxable Year to which the allocation relates).

(ii)     Any net loss not allocable to a Member as a result of the application of Section 4.04(d)(i) hereof shall be allocated to the Managing Member, excluding any additional Managing Member admitted pursuant to Section 8.04.

(iii)     If, during any year, the Company incurs a Loss in excess of the Loss anticipated for such year and such excess Loss arises from expenses paid or to be paid with the proceeds of Capital Contributions or Operating Deficit Loans from a Managing Member, from withdrawals from reserves, or from amounts paid by a Guarantor pursuant to the Guaranty, then, at the end of each such year, the Investor Member's Capital Account and allocable share of Minimum Gain at the end of each year from the date of calculation through the end of the Credit Period shall be calculated. If such calculation indicates that the Investor Member would have an adjusted Capital Account deficit in any such year in the Credit Period in excess of the sum of the Investor Member's share of Minimum Gain (determined in accordance with the provisions of Regulation § 1.704-2(g)) plus the amount of its negative Capital Account that the Investor Member has agreed to restore, then the portion of the Loss derived from the expenses described in the first sentence of this Section 4.04(d)(iii) (but not depreciation) shall be allocated to the Managing Member to extent of the projected excess adjusted Capital Account deficit of the Investor Member; provided that the Managing Member shall be specially allocated an amount of gross income (before Profits and Losses are computed under Section 4.01(a)) equal to the amount of any principal repayment in any year of an Operating Deficit Loan or any repayment or return of a Managing Member Capital Contribution (but in no event shall the aggregate amount of gross income allocated pursuant to this clause exceed the aggregate amount of deductions or losses allocated to the Managing Member under this Section 4.04(d)(iii)).

(e)     In the event that, at any time or from time to time after the effective date of this Agreement, the Gross Asset Values of the Company Assets are adjusted in accordance with this Agreement, then, notwithstanding the provisions of Section 4.01(b) hereof, the Members' allocable shares of depreciation, depletion, amortization and gain or loss, as computed for tax purposes, with respect to the Company property, must be determined so as to take into account the variation between the adjusted tax basis of the Company property and the book value, in the same manner as under I.R.C. § 704(c) and the applicable Regulations thereunder. Allocations pursuant to this paragraph (e) shall be solely for purposes of federal, state and local taxes and shall not affect or in any way be taken into account in computing a Member's Capital Account.

(f)     If an Interest is transferred or assigned during a Company Accounting Year, that part of the tax incidents allocated pursuant to this Article IV with respect to the

Interest so transferred shall, in the discretion of the Managing Member, either (i) be based on segmentation of the taxable year between the transferor and the transferee using the interim closing of the books or any other reasonable method or (ii) be allocated between the transferor and the transferee in proportion to the number of days in such taxable year during which each owned such Interest, as disclosed on the Company's books and records.

(g)    Any depreciation recapture recognized pursuant to I.R.C. Sections 1245 and 1250 and Credit recapture shall be allocated to the Members in the same proportions that the depreciation or cost recovery deductions and Credits giving rise to such recapture were allocated among such Members or their respective predecessors-in-interest.  Any taxable income of the Company resulting from its receipt of debt forgiveness, donations, contributions, grants or subsidies shall be allocated entirely to the Managing Member. Subject to Sections 4.04(a) to (d)(i) and notwithstanding any other provisions in the Operating Agreement to the contrary, the Managing Member will not be allocated less than or more than 1.0% of each item of Company income, gain, loss, deduction, credit, and basis throughout the entire period that the Managing Member is a Member.

(h)    In the event that there is a determination that I.R.C. § 483 or I.R.C. § 1274 (both relating to imputed interest with respect to deferred payment sales of property) is applicable to any loans between the Company and a Member, or that any loan between a Member and the Company is subject to I.R.C. § 7872 (relating to imputed interest with respect to below-market interest rate loans), any income or deduction attributable to interest on such a loan (whether stated or unstated) shall be allocated solely to such Member.

(i)    It is the intent of the Members that each Member's allocable share of income, gains, losses, deductions or credits (or items thereof) ("Company Items") shall be allocated in accordance with this Article IV to the fullest extent permitted by I.R.C. Sections 704(b) and 704(c).  In order to preserve and protect the allocations provided for in this Article IV, without adversely affecting the amounts distributable upon termination of the Company, the Managing Member, with the review and concurrence of the Company's Accountants, is authorized and directed, in its reasonable judgment, to allocate Company Items arising in any year differently than otherwise provided for in this Article IV if, and to the extent that, the allocations otherwise provided under this Article IV would not be permissible under I.R.C. Sections 704(b) and/or 704(c).  Any allocation made pursuant to this Section 4.04(i) shall be deemed to be a complete substitute for any allocation otherwise provided for in this Article IV, and no amendment of this Agreement or approval of any Member shall be required with respect thereto and each Member shall, for all purposes and in all respects, be deemed to have approved any such allocation.  The allocations set forth in this Section 4.04 (the "Special Allocations") are intended to comply with certain requirements of the Section 704 Regulations.   The Special Allocations may not be consistent with the manner in which the Members intend to divide Company distributions.  Accordingly, the Managing Member is hereby authorized and directed to divide other allocations of income, gain, loss and deductions among the Members so as to prevent the Special Allocations from distorting the manner in which

Company distributions will be divided among the Members on dissolution of the Company. In general, the Members anticipate that this will be accomplished by specially allocating items of income, gain, loss, and deduction among the Members so that the net amount of the Special Allocations and such special allocations to each such Member is zero. In the event that in any year a Special Allocation alters the allocation of tax items to the Members, to the extent possible, depreciation deductions shall nevertheless be allocated 99% to the Investor Member and 1.0% to the Managing Member.

(j)    Notwithstanding anything to the contrary contained herein, the Managing Member (or, if there is more than one Managing Member, all of the Managing Members as a group) shall be allocated not less than 1.0% of each material item of Company income, gain, loss, deduction and credit ("Company Items") at all times during the existence of the Company. In the event that there is no allocation of a material Company Item to the Managing Member(s) hereunder or if the amount of any material Company Item allocable to the Managing Member(s) hereunder shall not equal 1.0% of the aggregate amount allocable to all the Members without giving effect to this provision, then the amount of such Company Item(s) otherwise allocable to the Members hereunder shall be correspondingly reduced in order to assure the Managing Member(s) of its or their 1.0% share. Any such reduction shall be applied to reduce the shares of all classes of Members in proportion to their respective Interests.

(k)    The Members agree that the Members' Interests in Company profits for purposes of determining such Members' shares of the excess nonrecourse liabilities of the Company under Treasury Regulation § 1.752-3(a)(3) shall be 99% to the Investor Member and 1.0% to the Managing Member.

(l)    Except as otherwise provided in this Agreement, for tax purposes all items of income, gain, loss, deduction or credit shall be allocated to the Members in the same manner as are Profits and Losses.

**Section 4.05. Section 704(c) Allocations**. Income, gains, losses and deductions, as determined for income tax purposes, with respect to any Company Asset contributed by a Member to the capital of the Company shall, solely for income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such Company Asset to the Company for federal income tax purposes and its initial Gross Asset Value in accordance with I.R.C. Section 704(c) and the Regulations thereunder.

**Section 4.06. Miscellaneous Allocations**.

(a)    If any Company expenditure treated as a deduction on its federal income tax return is disallowed as a deduction and treated as a distribution pursuant to Section 731(a) of the Code, there shall be a special allocation of gross income to the Managing Member deemed to have received such distribution equal to the amount of such distribution.

(b)     Except as otherwise provided in this Article IV, Profits, Losses, Credits, gain and other tax items allocated to the Members shall be allocated among the Members in accordance with their relative Interests in the Company, as set forth in Exhibit C.

(c)     Except as otherwise set forth in this Agreement, any elections or other decisions relating to allocations under this Article IV shall be made by the Managing Member (in its reasonable discretion), with the review and concurrence of the Company's Accountants, in such manner as reasonably reflects the purpose and intention of this Agreement.

## ARTICLE V

## COMPANY BORROWINGS

**Section 5.01. Authorization to the Managing Member**.  Without otherwise limiting the right or authority of the Managing Member under this Article V or Article VI hereof, the Managing Member is specifically authorized to execute on behalf of the Company all documents required by any Lender in connection with the construction, acquisition or financing of the Apartment Complex.

**Section 5.02. Right To Mortgage**.

(a)     The Company has obtained or will, subject to the requirements of this Agreement, obtain financing for the Apartment Complex from the Lender and will secure the same by execution and delivery of the Mortgage.  The Project Documents shall provide that no Person, including, but not limited to, the Company, any party holding an Interest in the Company, or any of their Affiliates, shall have any personal liability for the payment of all or any part of such Mortgage loans, except as set forth in the Project Documents in existence as of the date hereof.

(b)     Subject to the requirements of this Agreement, the Managing Member is specifically authorized to execute such documents as it reasonably deems necessary in connection with the acquisition, improvement, operation, leasing and financing of the Apartment Complex, including, without limiting the generality of the foregoing, the Project Documents and any other document required by any Lender in connection therewith.

**Section 5.03. Loans**.  All borrowings by the Company shall be subject to the terms of this Agreement and the Project Documents.  To the extent borrowings are permitted, they may be made from any source, including any Member or an Affiliate thereof.  All such loans will be nonrecourse unless the Consent of the Members has been obtained.

## ARTICLE VI

## RIGHTS, POWERS AND OBLIGATIONS OF MANAGING MEMBER

**Section 6.01. Exercise of Management**.

(a)     The overall management and control of the business, assets and affairs of the Company shall be vested in the Managing Member and the Managing Member, in extension of and not in limitation of the powers given it by law, shall have full, exclusive and complete charge of the management of the business of the Company in accordance with its purposes stated in Section 1.04 hereof.  No Investor Member shall take part in the management or control of the business of the Company or have authority to bind the Company.

(b)     The Managing Members shall manage the business of the Company, except where otherwise specified or limited herein.

**Section 6.02. Powers**.  Subject to Article V and Section 6.03 and the other provisions of this Agreement, the Managing Member shall have all authority, rights and powers generally conferred by law, including the authority, rights and powers of a managing member in a limited liability company, and shall have all the authority, rights and powers which it deems necessary or appropriate to effect the purposes of the Company.

(a)     During the Compliance Period, the Managing Member shall (i) operate the Apartment Complex and cause the Management Agent to manage the Apartment Complex in such a manner that 100% of the residential rental units (not including any manager units) in the Apartment Complex will qualify as "low-income units" under Section 42(i)(3) of the Code; (ii) operate the Apartment Complex and cause the Management Agent to manage the Apartment Complex in such a manner that the Apartment Complex will qualify as a "qualified low-income housing project" under Section 42(g) of the Code; and (iii) make, or cause to be made, all certifications required by Section 42(l) of the Code.

(b)     In the event that a claim against the Company is made by the Service (a "Claim") upon audit, the Tax Matters Member shall, within 10 days after receiving notice of such Claim, notify the Investor Member of the Claim (such notice being referred to as a "Claim Notice").  The Tax Matters Member shall promptly furnish to the Investor Member a copy of each notice or other communication received by the Tax Matters Member from the Service.

The Company shall indemnify the Tax Matters Member from and against judgments, fines, amounts paid in settlement, and expenses (including attorneys' fees) reasonably incurred in any civil, criminal or investigative proceeding in which it is involved or threatened to be involved by reason of being the Tax Matters Member, provided that the Tax Matters Member acted in good faith, within what is reasonably believed to be the scope of its authority and for a purpose which it reasonably believed to be in the best interests of the Company or the Members.  The Tax Matters Member shall not be indemnified under this provision against any liability to the Company or its Members to any greater extent than the indemnification allowed by Section 6.06 of this Agreement.  The indemnification provided hereunder shall not be deemed to be exclusive

of any other rights to which those indemnified may be entitled under any applicable statute, agreement, vote of the Members, or otherwise.

**Section 6.03. Other Activities**. The Managing Member shall be required to devote only so much of its time as it reasonably deems necessary for the proper management of the Company business. Affiliates of the Managing Member may engage or possess an interest, independently or with others, in other businesses or ventures (including limited liability companies) of every nature and description, including, without limitation, serving as managing member of other limited liability companies which own, either directly or through interests in other limited liability companies, projects similar to or that compete with the Apartment Complex. Neither the Company nor any Member shall have any rights in or to such ventures or the income or profits derived therefrom and nothing shall be construed to render them partners in any such business ventures.

**Section 6.04. Liability to Company and Investor Member and Indemnification of Investor Member and Company**.

(a)    Except as otherwise provided in this Agreement, the Managing Member shall not be liable, responsible or accountable in damages or otherwise to the Investor Member or to the Company for any acts performed in good faith and within the scope of authority of the Managing Member pursuant to this Agreement, unless otherwise provided in this Agreement; provided, however, that the Managing Member shall be liable for violations of laws, for acts and/or omissions to the extent attributable to the Managing Member's fraud, willful misconduct or gross negligence and for any breach of fiduciary duty and/or breach of the Managing Member's representations, warranties or obligations under this Agreement.

(b)    The Managing Member shall indemnify, defend and hold harmless the Investor Members and the Company (and the Company shall indemnify, defend and hold harmless the Investor Members) from and against any loss, liability, damage, cost or expense (including reasonable attorney's fees) to the extent that (i) the Managing Member's acts and/or omissions constituted a violation of law, fraud, willful misconduct or gross negligence, (ii) the Managing Member breached its fiduciary duty or any obligation under this Agreement and such breach had a material adverse effect on the Company or the Investor Member; or (iii) the Managing Member materially breached any of the representations or warranties set forth herein or the covenants set forth herein, which breach had a material adverse effect on the Company or on the Investor Member.

(c)    The indemnification rights contained in this Section 6.05 shall survive dissolution of the Company and withdrawal, removal, incompetence, bankruptcy or insolvency of a Managing Member and shall be cumulative of, and in addition to, any and all rights, remedies and recourses to which the Investor Member shall be entitled, whether pursuant to the provisions of this Agreement, at law or in equity.

(d)    All rights of the Investor Member to indemnification shall survive the dissolution of the Company and the insolvency, dissolution or bankruptcy of the Investor

Member; provided, however, that a claim for indemnification hereunder must be made by or on behalf of the Person seeking such indemnification prior to the time distribution in liquidation of the Company assets is made pursuant to Sections 1.05 and 4.03 hereof.

**Section 6.05.  Indemnification of Managing Member**.

(a)     The Company shall indemnify, defend and hold harmless the Managing Member from and against any loss, liability, damage, cost or expense (including reasonable attorney's fees) arising out of or alleged to arise out of any demands, claims, suits, actions or proceedings against the Managing Member, in or as a result of or relating to its capacity, actions or omissions as Managing Member of the Company, or otherwise concerning the business or affairs of the Company; provided, however, that the acts or omissions of a Managing Member shall not be indemnified hereunder to the extent that the same resulted from fraud, willful misconduct, a breach of fiduciary duty or a breach of its obligations under this Agreement which has a material adverse effect on the Company or the Investor Member or gross negligence.  This indemnification shall be made solely from the assets of the Company, and no Member shall be personally liable therefor.

(b)     The indemnification authorized by this Section 6.06 shall include, but not be limited to, payment for (i) reasonable attorneys' fees or other expenses incurred in connection with settlement or in any finally adjudicated legal proceeding, and (ii) the removal of any liens affecting any property of the indemnitee; provided, however, that the provision of attorneys' fees or other expenses and costs shall not be operative if the legal action is initiated by the Investor Member of the Company.  The Company shall not pay for any insurance covering liability of the Managing Member for actions or omissions for which indemnification is not permitted hereunder.

(c)     The indemnification rights contained in this Section 6.06 shall be cumulative of, and in addition to, any and all rights, remedies and recourses to which the Managing Member (in its capacity as managing member) shall be entitled, whether pursuant to the provisions of this Agreement, at law or in equity.

(d)     All rights of the Managing Member to indemnification shall survive the dissolution of the Company and the death, retirement, incompetency, insolvency, dissolution or bankruptcy of the Managing Member, or the Withdrawal of the Managing Member pursuant to Section 10.06 hereof; provided, however, that a claim for indemnification hereunder must be made by or on behalf of the Person seeking such indemnification prior to the time distribution in liquidation of the Company Assets is made pursuant to Sections 1.05 and 4.03 hereof.

**Section 6.06.  Dealing With Affiliates**.  Except as otherwise provided in this Agreement, the Managing Member may, for, in the name and on behalf of, the Company, enter into agreements or contracts for performance of services for the Company as an independent contractor with the Managing Member or Affiliates thereof, and the Managing Member may obligate the Company to pay compensation for and on account of any such services; provided,

however, such compensation and services shall be on terms comparable to those obtainable from qualified third parties in an arm's-length transaction.

**Section 6.07. No Salary Payable to Managing Member**.  The Managing Member shall not be paid any salary or other compensation for serving as managing member.  Notwithstanding the foregoing, the Managing Member shall be entitled to (a) the payment of certain fees for rendering services to the Company in capacities as other than a Managing Member of the Company as provided in Article VII and (b) reimbursement for other reasonable fees and expenses incurred on behalf of the Company, including costs of insurance, expenses incurred in connection with distributions to and communications with the Investor Member and the bookkeeping and clerical work necessary in maintaining relations with the Investor Member (including the costs and expenses incurred by the Managing Member or its Affiliates in printing and mailing checks, statements and reports), and any other reasonable expenses which it may incur on behalf of the Company in connection with the Company business.

**Section 6.08. Representations and Warranties**.   The Managing Member hereby represents and warrants (and covenants, as applicable) to the Investor Members and to the Company that the following are true and accurate as of the date hereof:

(a)     The execution and delivery by the Managing Member of this Agreement and the transactions contemplated hereby have been duly authorized by all necessary corporate or other action, and the consummation of any such transactions contemplated hereby with or on behalf of the Company does not constitute a breach or violation of, or a default under, the statutes, regulations, bylaws or other governing instruments of the Managing Member or any agreement by which it or any of its property is bound, nor a violation of any law, administrative regulation or court decree, any of which would have a material adverse effect on the Company.

(b)     The Company is a limited liability company, validly existing and in good standing under the laws of the State (and, if different, in the state of its organization), is authorized to transact business in the State and has the requisite power to carry on its business, to enter into and perform under the Project Documents, and to carry out the transactions contemplated hereunder, and the Company has complied with all filing requirements necessary to preserve the limited liability of the Investor Member and the Special Member.

(c)     No Events of Bankruptcy (or events which, in the course of time, would result in an Event of Bankruptcy) have occurred with respect to the Managing Member or any Guarantor (or, in the case of a Managing Member or Guarantor that is a partnership or limited liability company, with respect to the general partner(s), managing members or manager(s) of such Managing Member or Guarantor).

(d)     The Managing Member shall ensure that the books of the Company shall be kept on the accrual basis and the fiscal and tax year of the Company shall be the calendar year.

(e)     The Managing Member has disclosed all material actions with respect to the Company taken by the Managing Member prior to the date hereof.

(f)     The Company has good and marketable title to the Apartment Complex free and clear of all material liens, charges, encumbrances, security interests or statutory liens (other than the Mortgage), except (A) for those easements, reservations, restrictions or other matters that (i) would not materially adversely affect the Apartment Complex or its contemplated use or (ii) have been bonded against in such a manner as to preclude the holder of the lien or claimant from having any recourse to the Company or the Company's property and (B) for liens for taxes and assessments which are not yet due and payable.

(g)     The Managing Member is not, to the best of its knowledge, in default in the observance or performance of any provision of this Agreement to be observed or performed by the Managing Member.

(h)     The Managing Member has been duly organized, is validly existing and in good standing under the laws of the State (and, if different, its state of incorporation) and has all requisite power to be a Managing Member and to perform its duties and obligations as contemplated by this Agreement and the Project Documents.  Neither the execution and delivery by the Managing Member of this Agreement nor the performance of any of the actions of the Managing Member contemplated hereby has constituted or will constitute a violation of (a) the articles of organization or bylaws of the Managing Member, (b) any agreement by which the Managing Member is bound or to which any of its property or assets is subject, or (c) any law, administrative regulation or court decree.

(i)     To the best of its knowledge, no event has occurred which has caused, and the Managing Member has not acted in any manner which will cause (i) the Company to be treated for federal income tax purposes as an association taxable as a corporation, (ii) the Company to fail to qualify as a limited liability company under the Uniform Act, or (iii) any Investor Member to be liable for Company obligations in excess of its agreed-to Capital Contributions.

(j)     To the best of the Managing Member's knowledge, there are no violations by the Company or the Managing Member of any zoning, environmental or similar regulation applicable to the Apartment Complex which could have a material adverse effect thereon, and the Company has complied with all applicable municipal and other laws, ordinances and regulations relating to such construction and use of the Apartment Complex, and the Company has obtained (or will obtain when necessary) all permits and licenses necessary for the construction, use, occupancy and operation of the Apartment Complex.  All appropriate public roadways, public utilities, including sanitary and storm sewers, water, gas and electricity are or will be available and operating properly for each unit in the Apartment Complex at the time of the first occupancy of such unit.

(k)     There is and shall be no personal liability of the Investor Member for the repayment of the principal of or payment of interest on the Mortgage during its term.

(l)     Neither the Company nor the Apartment Complex is in violation of Clean Air Act, Clean Water Act, Resources Conservation and Recovery Act, Toxic Substance Control Act, Safe Drinking Water Control Act, Comprehensive Environmental Response, Compensation and Liability Act and Occupational Safety and Health Act or any other federal, state or local law relating to hazardous substances.  Neither the Managing Member nor the Company has received any notice from any governmental agency that the Company, Apartment Complex or land upon which it is located is in violation of any such law.

**Section 6.09.  Covenants Relating to the Apartment Complex and the Company**. The Managing Member shall have the following duties and obligations with respect to the Apartment Complex and the Company, and covenants that:

(a)     The Apartment Complex will be operated in a manner which satisfies and shall continue to satisfy all restrictions, including tenant income and rent restrictions, applicable to projects generating Credits.  All requirements shall be met which are necessary to obtain or achieve compliance with the 40-60 "set-aside test" as defined in Section 42(g)(1)(B) of the Code, the "rent restriction" test as defined in Section 42(g)(2) of the Code, and any other requirements necessary for the Apartment Complex to initially qualify, and to continue to qualify, for Credits as to 60% of the residential rental units, (such 60% requirement to be met from and after the end of the first year of the Credit Period).

(b)     While conducting the business of the Company, it shall not act in any manner which it knows or should have known after due inquiry would (i) cause the termination of the Company for federal income tax purposes without the Consent of the Investor Member, (ii) cause the Company to be treated for federal income tax purposes as an association taxable as a corporation, (iii) cause the Company to fail to qualify as a limited liability company under the Uniform Act or (iv) cause an Investor Member to be liable for Company obligations in excess of its unpaid Capital Contributions plus any distributions required to be returned pursuant to the Uniform Act, provided that the Managing Member shall not be in breach of this Section if such liability is caused by an action or inaction of any Investor Member.  The Company will not (A) own or acquire any asset or property other than the Apartment Complex and incidental personal property necessary for the ownership or operation of the Apartment Complex or (B) engage in any business other than that related to acquiring, owning, constructing and operating the Apartment Complex.

(c)     The Managing Member shall exercise good faith in all activities relating to the conduct of the business of the Company, including the acquisition, operation and maintenance of the Apartment Complex, and shall take no action in its capacity as Managing Member with respect to the business and property of the Company which is not reasonably related to the achievement of the purpose of the Company;

(d)     The Managing Member shall be responsible for the management and operation of the Company, including the oversight of the rent-up and operational stages of the Apartment Complex, and it shall promptly take all action that may be necessary or appropriate for the proper development, maintenance and operation of the Apartment Complex in accordance with the provisions of this Agreement and the Project Documents. In this regard, among other things, it shall have the obligations to keep the Apartment Complex in good working order and condition, reasonable wear and tear excepted, to not commit waste with respect to the Apartment Complex and to promptly repair or replace any damage to the Apartment Complex.

(e)     The Company will make on a timely basis all tax return and other filings necessary to qualify for the Credits. The Managing Member shall provide the initial Forms 8609 to the Investor Member at least 14 calendar days (but in all events within 10 days of receipt thereof by the Managing Member) prior to the date such Forms are required to be filed with the Internal Revenue Service;

(f)     It will hire the Accountants and provide them with such information in its possession and sign such documents as are necessary for the Company to make timely, accurate and complete submissions of federal and state income tax returns. The parties hereto covenant and agree that the Accountants identified in Section 2.01 shall be the accountants for the Company for the purposes of preparing such returns. The Managing Member and the Company hereby agree, authorize and direct the Accountants to provide contemporaneous copies to the Investor Member of all tax returns, audits and any other information described in this Article VI or Section 12.06 that the Accountants deliver to the Managing Member or to the Company;

(g)     It will use all reasonable efforts to cause the Apartment Complex to be kept in compliance with all applicable zoning regulations, ordinances, and subdivisional laws, rules, and regulations;

(h)     It shall use all reasonable efforts to maintain the Apartment Complex and the land upon which it is located so that there is no discharge, release, spillage, uncontrolled loss or seepage of any oil, petroleum or chemical liquids or solids, liquid or gaseous products or any hazardous wastes or hazardous substances (as such terms are used in the Comprehensive Environmental Response, Compensation and Liability Act of 1980) which causes a genuine risk to the health or safety of the residents or employees of the Apartment Complex. The Managing Member shall maintain the Apartment Complex and the land upon which it is located so as not to violate the Clean Air Act, Clean Water Act, Resource Conservation and Recovery Act, Toxic Substance Control Act, Safe Drinking Water Control Act, Comprehensive Environmental Response, Compensation and Liability Act and Occupational Safety and Health Act and other federal, state and local laws governing hazardous substances. In addition, the Managing Member shall provide the Investor Member with prompt written notice (i) upon any Managing Member or Affiliate thereof obtaining knowledge of any potential or known release, or threat of release, of any hazardous material at or from the Apartment Complex; (ii) upon any Managing Member receiving any notice to such effect from any federal, state, or other

governmental authority, or (iii) upon any Managing Member obtaining knowledge of any incurrence of any expense or loss by any such governmental authority in connection with the assessment, containment, or removal of any hazardous material for which expense or loss a Lien may be imposed on the Apartment Complex;

(i)    The Managing Member shall cause the Company to maintain in full force and effect with reputable licensed insurers (each insurer must have a Standard & Poor's rating of "A" or better or a rating from A. M. Best Co. of A-V or better), such insurance policies, including fire and extended coverage insurance, as may be required by any Lender. Flood insurance will also be required if the Apartment Complex is located in a Special Flood Hazard Area (Zones A or V) as designated by the Federal Emergency Management Agency ("FEMA") in an amount equal to the lesser of: (a) the minimum amount required under the terms of coverage to compensate for any damage or loss on a replacement basis; or (b) the maximum insurance available under the appropriate National Flood Insurance Administration program. Unless a higher minimum amount is required by FEMA or other law, the maximum deductible clause for such flood insurance should be no more than $3,000 per building. Title to the Apartment Complex shall be insured at all times by a reputable title insurance company in an amount equal to at least the sum of the then outstanding debt secured by the Apartment Complex plus the amount of the Members' Capital Contribution commitment reflected on Exhibit C hereto. All required insurance will be and shall be in effect and will be kept in full force and effect during the Company's ownership of the Apartment Complex;

(j)    In addition, except as otherwise required by applicable governmental agencies or regulations, the Managing Member shall not discuss or otherwise disclose any of the terms or conditions of the Investor Member's investment in the Company except in the ordinary course of business; provided, however, any of the Members (and each employee, representative, or other agent of any of the Members) may, without limitation of any kind, disclose to any and all Persons the tax treatment and tax structure of the Investor Member's investment in the Company and all materials of any kind (including, opinions or other tax analyses) that are provided to any of the Members relating to such tax treatment and tax structure. In addition, the Company and its Members shall be permitted to disclose to any and all Persons, without limitation of any kind, the "tax treatment and tax structure" (as defined in Treasury Regulation Section 1.6011-4(c)) of the transaction contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) relating to such tax treatment and tax structure. The Managing Member will notify the Members of any "reportable transaction" under Treasury Regulation Section 1.6011-4 in which the Company or Managing Member shall engage. The Managing Member hereby notifies the other Members that the transactions provided for in this Agreement may constitute a "reportable transaction".

**Section 6.10. Operating Deficit Loans.** If, at any time the Managing Member may (but shall not be required) fund an Operating Deficit through Operating Deficit Loans.

All Operating Deficit Loans shall bear interest at the rate of 10% per annum, compounded annually, and shall be repayable from Cash Flow or Net Proceeds as provided in Article IV. No Person (including, without limitation, any creditor of the Company) shall be entitled to rely on the Managing Member's undertaking to make Operating Deficit Loans as set forth in this Section 6.12

## ARTICLE VII

## PAYMENTS TO MANAGING MEMBERS AND AFFILIATES AND OTHERS

**Section 7.01. Property Management Fee**. Subject to any restrictions set forth in the Project Documents, the Company shall pay to the Management Agent a monthly fee in the amount of 5% of the Effective Gross Income for the preceding month for its services in managing the Apartment Complex.

## ARTICLE VIII

## RIGHTS AND OBLIGATIONS OF INVESTOR MEMBERS

**Section 8.01. Liability of Investor Members**. The Investor Members shall be liable only to make their respective Capital Contributions as and when due hereunder. After their Capital Contributions are fully paid, no Investor Member shall be required to make any further Capital Contribution or lend any funds to the Company, and no Investor Member shall be liable for any debts, liabilities, contracts, or obligations of the Company, except as otherwise required by the Uniform Act.

**Section 8.02. No Right To Manage, Partition or Dissolve**. No Investor Member shall take part in the management, control, conduct or operation of the Company (or the Apartment Complex), or have any right, power or authority to act for or bind the Company. No provision of this Agreement which makes the Consent of the Investor Member a condition for the effectiveness of an action taken by the Managing Member is intended, and no such provision shall be construed, to give the Investor Member the right to participate in the control of the Company business. No Investor Member shall have the right to bring an action for partition or dissolution against the Company as long as the Company is operated in accordance with Section 1.04 hereof, and the Investor Member hereby waives, to the full extent permitted by law, the right to institute an action for partition or dissolution as long as the Company is operated in accordance with Section 1.04 hereof.

**Section 8.03. Death or Disability of Investor Member**. The Company shall not be dissolved by the death, insanity, adjudication of incompetency, bankruptcy, insolvency or Withdrawal of any Investor Member, by the assignment of the Interest of an Investor Member, or by the admission of a Substituted Investor Member.

**Section 8.04. Removal of a Managing Member**.

(a)    The Investor Member shall have the right to remove a Managing Member and elect or appoint a new Managing Member in the following events:

(i)    in the event of fraud or any felony conviction of the Managing Member;

(ii)    the Managing Member's performance constituting bad faith, willful misconduct, gross negligence or breach of fiduciary duty, which performance results in a material adverse effect on the Company or any of its Members;

(b)    Upon the removal of a Managing Member, the Company shall acquire the Interest of the removed Managing Member for an amount equal to the greater of (i) $100 or (ii) the Capital Account balance of the removed Managing Member on the date of removal. Amounts owed to the removed Managing Member pursuant to the preceding sentence shall be payable by the Company, without interest, upon the end of the Compliance Period for the Apartment Complex or the sale of all or substantially all of the Company's assets. Nothing in this Section 8.04(b) shall limit or reduce the rights of the removed Managing Member or any Affiliate thereof to receive any fees for services previously performed or repayment of Operating Deficit Loans, if any, in accordance with the terms thereof.

**Section 8.05. Outside Activities**.    Nothing herein contained shall be construed to constitute an agreement by which any Member hereof shall have become the agent of any other Member hereof or to limit in any manner the Member in the carrying on of its own business or activities. Any Member may engage in and/or possess any interest in other business ventures (including partnerships of whatever kind) of every nature and description, independently or with others, whether existing as of the date hereof or hereafter coming into existence. Neither the Company nor any other Member hereof shall have any rights in or to any such independent ventures or the income or profits derived therefrom and nothing shall be construed to render them partners in any such other business ventures.

## ARTICLE IX

## TRANSFERABILITY OF INVESTOR MEMBER INTERESTS

**Section 9.01. Consent of Managing Member Required for Sale, Transfer, Assignment**. No Member may sell, transfer, assign or otherwise dispose of all or any part of its Interest without the prior written consent of the Managing Member. Any assignment of a Member's Interest in the Company shall be deemed to be effective as of the first day of the month on which the transfer occurs and each assignee shall automatically become a Substituted Investor Member. Investor Members may each individually enter into a separate put agreement with the Managing Member related to the transfer of the Investor Member's Interest to the Managing member or its designee.

**Section 9.02. Member Cooperation**. In conjunction with any sale, transfer, assignment or other Disposition by a Member of all or any part of an Interest in the Company accordance

with the provisions of this Article IX, the Managing Member is authorized to obtain updated UCC, judgment and tax lien searches with respect to the Members and the Company and to disclose information concerning the Company, the Members, and any other Persons involved in the operation of the Apartment Complex and to initiate contact (and take any other actions needed to obtain required consents) with any Lender or other third-party whose consent to such Disposition may be required. The Investor Members represent and agree that they will take all actions reasonably necessary to cooperate with the Managing Member with respect to any sale, transfer, assignment or other Disposition made in accordance with this Article IX.

## ARTICLE X

## WITHDRAWAL OF A MANAGING MEMBER; DISPOSITION OF A MANAGING MEMBER'S INTEREST

**Section 10.01. Transfer and Withdrawal**. Except as set forth in Section 10.06, no Member may voluntarily Withdraw from the Company or transfer all or any part of its Interest in the Company without the Consent of the Managing Member.

**Section 10.02. Obligation To Continue**. Except as set forth in Section 10.06, upon the Withdrawal of a Managing Member, the Company shall terminate except that any remaining Managing Member shall have the right and obligation to elect to continue the business of the Company and shall, within 30 days, notify the Investor Member of such Withdrawal and such election.

**Section 10.03. Withdrawal of All Managing Members**. If, following the Withdrawal of a Managing Member, there is no remaining Managing Member, all remaining Members may unanimously, within 90 days from the date of Withdrawal, elect in writing to reconstitute the Company and continue the business of the Company for the balance of its term by selecting a successor Managing Member. If the Investor Members elect and admit a successor Managing Member, the relationship among the then Members shall be governed by this Agreement.

**Section 10.04. Additional Members**. The Managing Member shall have the right to designate one or more Persons as additional Managing Members. Notice of any such designation shall be promptly given to all the other Members. The Managing Member shall assign to such Persons such portion of its Interests as may be agreed upon by the Managing Member and such Persons, provided such assignment does not cause a loss or recapture of the Credit to the Investor Member and does not jeopardize the classification of the Company as a limited liability company under the Code.

## ARTICLE XI

## MANAGEMENT AGENT AND MANAGEMENT FEE

(a)     The Managing Member shall have the responsibility for supervising the management of the Apartment Complex and the Management Agent.

(b)     The Management Agent shall receive a management fee payable by the Company in accordance with the terms of this Agreement and the Management Agreement.     The Company is authorized to executed any Management Agreement approved by the Managing Member.

(c)     The Managing Member will have the duty to manage the Apartment Complex during any period when there is no management agent (until such time as a replacement management agent satisfactory to the Managing Member is found, and the parties hereto agree to use their best efforts to agree on an acceptable replacement management agent within 30 days) and the Company will pay the Managing Member for such services a management fee equal to such amount as may be deemed to be reasonable and no greater than the amount that would be paid to an unrelated party performing substantially similar services.

## ARTICLE XII

## BOOKS AND RECORDS; ACCOUNTING; TAX ELECTIONS; ETC.

**Section 12.01.  Books and Records**.  The Company shall maintain all books and records which are required under the Uniform Act, the Code and Regulations, or by any governmental agencies having jurisdiction and may maintain such other books and records as the Managing Member deems advisable.  All records required to determine the Company's ability to claim Credits (including, without limitation, records regarding Eligible Basis of the Apartment Complex and records pertaining to the qualification and recertification of tenants) shall be kept and maintained during the entire Compliance Period plus six years thereafter (provided that records with respect to tenants who are other than the initial occupants of a unit need be maintained only for a period of six years).  The Company will also maintain a list of the names and addresses of all Members.  The books and records and list of Members shall be available for examination by any Member, or its duly authorized representatives, at the principal office of the Company at any and all reasonable times.

**Section 12.02.  Bank Accounts**.  The bank accounts of the Company shall be maintained at such financial institution as determined by the Managing Member.  Withdrawals shall be made only in the regular course of Company business on such signature(s) as the Managing Member may determine.  All deposits and other funds not needed in the operation of the business in the discretion of the Managing Member shall be deposited in Qualified Investments selected in the sole and absolute discretion of the Managing Member.

**Section 12.03.  Accrual Basis**.  The books of the Company shall be kept on the accrual basis and the fiscal and tax year of the Company shall be the calendar year.

**Section 12.04.  Accountants**.  The Accountants shall prepare, for execution by the Managing Member, all Company Tax Returns and shall prepare all annual financial reports to the Members.

**Section 12.05. Federal Income Tax Elections**.  All elections made by the Company under the Code shall be made by the Managing Member, and the Managing Member shall provide notice to the Investor Members of such elections.  Notwithstanding any other notice requirements contained herein, furnishing copies of the Company Tax Returns shall constitute notice under this Section 12.05.

## ARTICLE XIII

## MISCELLANEOUS

**Section 13.01. Notice**.  All notices, demands, requests or other communications to be sent by one party to another hereunder or required by law shall be in writing and shall be deemed to have been validly given or served by delivery of the same in person to the intended addressee, or by depositing the same with Federal Express or another reputable private courier service for next business day delivery, or by depositing the same in the United States mail, postage prepaid, registered or certified mail, return receipt requested, in any event addressed to the intended addressee as follows:

If to the Managing Member:

> Foundation for Affordable Housing
> 320 North 22nd Street
> Omaha, NE  68102

with a copy to:

> Robert Coon, Esq.
> Kutak Rock LLP
> 1650 Farnam Street
> Omaha, NE 68102

All notices, demands and requests shall be effective upon such personal delivery, or one (1) business day after being deposited with the private courier or three (3) business days after being deposited in the United States mail as required above.  Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given as herein required shall be deemed to be receipt of the notice, demand or request sent.  By giving to the other parties hereto at least fifteen (15) days' prior written notice thereof in accordance with the provisions hereof, the parties hereto shall have the right from time to time to change their respective addresses and each shall have the right to specify as its address any other address within the United States of America.

**Section 13.02. Amendments**.  This Agreement may not be amended, revised, waived, discharged, released or terminated orally but only by a written instrument or instruments executed by each of the parties hereto.  Any alleged amendment, revision, waiver, discharge, release or termination which is not so documented shall not be effective as to any party.

**Section 13.03. Meetings**.  Meetings of the Company may be called by the Managing Member for any matter for which the Members may vote as set forth in this Agreement or to obtain information concerning the Company.  A list of names and addresses of all Members shall be maintained as part of the books and records of the Company and shall be made available upon request to any Member or its representative at cost.  Upon receipt of a request by a Member, either in person or by registered mail, stating the purposes of the meeting, the Managing Member shall provide the Members, within ten days after receipt of such request, written notice of a meeting and the purpose of such meeting to be held on a date not less than 15 nor more than 30 days after receipt of such request, at a time and place within or without the State convenient to the Members.

**Section 13.04. Entire Agreement**.  This Agreement and all other written agreements referred to herein constitute the entire agreement among the parties and supersede any prior agreements or understandings among them with respect to the subject matter hereof.

**Section 13.05. Headings**.  All article and section headings in this Agreement are for convenience of reference only and are not intended to qualify the meaning of any article or section.

**Section 13.06. Separability Provisions**.  If the operation of any provision of this Agreement would contravene the provisions of the Uniform Act, or would result in the imposition of general liability on any Investor Member, such provision only shall be void and ineffectual.

**Section 13.07. Binding Agreement**.  This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their successors and assigns, except as otherwise provided herein.  Among other things, the parties specifically intend that this Agreement inure to the benefit of any transferee of the Investor Member in accordance with the terms of Article IX hereof.

**Section 13.08. Counterparts**.  This Agreement may be executed in several counterparts, and all so executed shall constitute one agreement, binding on all the parties hereto.  Any counterpart of this Agreement, which has attached to it separate signature pages which together contain the signatures of all Members or is executed by an attorney-in-fact on behalf of some or all of the Members, shall for all purposes be deemed a fully executed instrument.

This Agreement may be executed as facsimile originals and each copy of this Agreement (or contribution request documents) bearing the facsimile transmitted signature of any party's authorized representative shall be deemed to be an original.

**Section 13.09. Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State, without regard to principles of conflicts of laws.  The parties agree and consent that venue for purposes of resolving any dispute or controversy relating to this Agreement shall be in the State.

**Section 13.10. Time of Admission.**  The Investor Member shall be deemed to have been admitted to the Company as of the day of the month in which it becomes an Investor Member for all purposes of this Agreement, including Article IV.

**Section 13.11. Waiver of Jury Trial.**  (a) Each of the parties hereto hereby knowingly, voluntarily and intentionally, after opportunity for consultation with independent counsel, waives its right to trial by jury in any action or proceeding to enforce or defend any rights or obligations (i) under this Agreement, (ii) arising from the financial relationship between the parties existing in connection with this Agreement or any loan document or (iii) arising from any course of dealing, course of conduct, statement (verbal or written) or action of the parties in connection with such financial relationship; (b) no party hereto will seek to consolidate any such action in which a jury trial has been waived with any other action in which a jury trial has not been or cannot be waived; (c) the provisions of this Section have been fully negotiated by the parties hereto, and these provisions shall be subject to no exceptions; (d) no party hereto has in any way agreed with or represented to any other party that the provisions of this Section will not be fully enforced in all instances; and (e) this Section is a material inducement for the Investor Member to enter into this Agreement.

**Section 13.12. Waiver of Certain Defenses.**  THE PARTIES HERETO ACKNOWLEDGE THAT THEY WERE REPRESENTED BY COMPETENT COUNSEL IN CONNECTION WITH THE NEGOTIATION, DRAFTING AND EXECUTION OF THIS AGREEMENT.

*[Signatures on the Following Page]*

*Signature Page*
*to*
*Operating Agreement*
*of*
*Cross Creek Apartments Holdings, LLC*
*by*
*Investor Members*

IN WITNESS WHEREOF, the Investor Members have executed this Operating Agreement of Cross Creek Apartments Holdings, LLC as of the 31st day of December 2009.

**INVESTOR MEMBERS**:

_____
**Thomas J. Rasmussen**

_____
**Daniel Stechschulte**

_____
**Mark Rasmussen**

*Signature Page*
*to*
*Operating Agreement*
*of*
*Cross Creek Apartments Holdings, LLC*
*by*
*Managing Member*

IN WITNESS WHEREOF, the Managing Member has executed this Operating Agreement of Cross Creek Apartments Holdings, LLC as of the 31st day of December 2009.

**MANAGING MEMBER:**

FOUNDATION FOR AFFORDABLE HOUSING

By _____

**Drew Fitch, Executive Director**

**EXHIBIT A**

**CAPITAL CONTRIBUTION REQUEST**
**[FORM]**

[_____], 200[_]

**[Investor Name]**
**[Investor Address]**

Re:     Capital Contribution Installment No. **[____]** as per the Operating Agreement dated **[December          , 2009]** (the "Agreement") by and between Cross Creek Apartments Holdings, LLC ("Company"), Foundation for Affordable Housing (the "Managing Member") and **[LIST NAMES OF INDIVIDUAL INVESTORS]** (collectively, the "Investor Members")

Ladies and Gentlemen:

We request, subject to the terms and conditions of the Agreement, that [NAME OF INDIVIDUAL], as an Investor Member advance **[_____]**.

**CROSS CREEK APARTMENTS HOLDINGS, LLC**

**By: Foundation for Affordable Housing, Its Managing Member**

By _____
Name _____
Title _____

## EXHIBIT B

## LEGAL DESCRIPTION OF APARTMENT COMPLEX

ALL that certain piece, parcel or lot of land, situate, lying and being on Port Royal Island, Beaufort County, South Carolina commencing at a concrete monument located at the junction of the Southeastern corner of property owned by John W. Gray, III and a paved road and running thence N 29°17'36" E for a distance of 320.24 feet to an iron pin; running thence N 29°13'42" E for a distance of 99.81 feet to an iron pin; running thence N 60°46'42" W for a distance of 13.53 feet to an iron pin; running thence on a curve with a Radius of 500.49 feet, a Length of 3.36 feet, a Chord of 3.36 feet, a Tangent of 1.68 feet; a Chord bearing of N 61°01'18" W; and a Delta of 00°23'05" to an iron pin; thence on a curve with a Radius of 500.49 feet, a Length of 298.89 feet, a Tangent of 154.05 feet, a Chord of 294.47 feet, a Chord Bearing of N 78°19'21" W and a Delta of 34°13'01"; running thence S 84°25'43" W for a distance of 51.91 feet to an iron pin; which is the POINT OF BEGINNING; running thence S 84°28'40" W for a distance of 518.60 feet to an iron pin; running S 84°28'48" W for a distance of 25.41 feet; running thence on a curve with a Radius of 250.49 feet, a Length of 153.82 feet, a Chord of 151.41 feet, a Tangent of 79.42 feet, a Chord bearing of N 77°54'41" W and a Delta of 35°10'59" to an iron pin; running thence N 60°15'21" W for a distance of 202.34 feet to an iron pin; running thence N 10°37'23" W for a distance of 326.20 feet to a concrete monument; running thence S 83°09'43" E for a distance of 82.97 feet; running thence S 84°47'35 E for a distance of 50.88 feet to a concrete monument; running thence S 85°19'33" E for a distance of 236.02 feet to a concrete monument; running thence S 85°18'32" E for a distance of 426.86 feet to a concrete monument; running thence S 86°12'14" E for a distance of 306.72 feet to an iron pin; running thence S 29°15'04" W for a distance of 356.92 feet to an iron pin which is the POINT OF BEGINNING. For a more complete description as to metes, bounds and distances, reference may be craved to said plat which is duly indexed and recorded in the Office of the Register of Deeds for Beaufort County, South Carolina in Plat Book 109 at Page 157.

**EXHIBIT C**

| Members | Capital Contribution | Ownership Interest Percentages |
|---|---|---|
| **Managing Member** | | |
| Foundation for Affordable Housing<br>320 North 22nd Street<br>Omaha, NE  68102 | $5,620 | 1.0% |
| | | |
| **Investor Members** | | |
| Thomas J. Rasmussen | $187,500 | 33% |
| Daniel Stechschulte | $187,500 | 33% |
| Mark Rasmussen | $187,500 | 33% |